CITY OF LITTLE ROCK ET AL *v.* MR. AND MRS.
JOHN A. PARKER ET AL

5-4005                                407 S.W. 2d 921

Opinion delivered November 14, 1966

[Rehearing denied December 12, 1966.]

*Joseph C. Kemp* and *Perry V. Whitmore,* for appellants.

*Butler, Greene & Byrd,* for appellees.

CARLETON HARRIS, Chief Justice. This appeal relates to an application for rezoning. Appellee, the "100" Club, is the owner of vacant property located at the southeast intersection of John Barrow Road and West Markham Street in the City of Little Rock. Immediately adjacent to this property, and also abutting West Markham Street, the other appellees, Mr. and Mrs. J. A. Parker, own property, which is improved with a brick dwelling that is the home of Mr. and Mrs. Parker. This area was annexed by the City of Little Rock in 1961, and appellees' properties, by reason of such annexation, were by operation of city ordinances, placed into an "A-One Family" zoning district. Appellees joined together in an application to the City of Little Rock, seeking to have the zoning classification changed to "F-Commercial." The City Planning Commission and Board of Directors of the City of Little Rock denied the application, and suit was instituted in the Pulaski County Chancery Court, wherein the court was asked to declare the action of the city in refusing to rezone in accordance with their application to be arbitrary. On trial, the court found that the properties belonging to appellees bordered and were adjacent to an already existing "F-Commercial" district, and that such properties were no longer desirable for residential purposes, because of the proximity to the "F-Commercial" zone; further, that the refusal to rezone, as requested, had the effect of arbitrarily depriving appellees of the use of their properties. The city was enjoined from interfering with the use of the realty for "F-Commercial" purposes. From the decree so entered, appellant brings this appeal.

The property owned by the Parkers is bounded on the east by commercial usage in the form of a shopping center, and the "100" Club property is bounded on the west by John Barrow Road, across which there is a single family residence and substantially open lands. Across West Markham Street, and north of Parkers' residence and the lands belonging to the "100" Club, there is a well-developed residential subdivision known

as Brookfield. The southern boundaries of the "100" Club property abuts Cunningham Lake Road, where this road intersects John Barrow Road, and the Parker property is separated from Cunningham Lake Road by one plot of unoccupied ground. Cunningham Lake Road, in general, runs parallel to the north bank of Rock Creek, and across this creek is located Henderson Junior High School. There are plans to develop a park on the land surrounding the school, and Federal funds have been requested.

William Putnam, a real estate broker of Little Rock, testified that, in his opinion, the involved properties were not suitable for residential purposes, and the highest and best use would be for commercial purposes. He was also of the opinion that a rezoning to commercial would not adversely affect property in Brookfield Addition. Putnam stated that these properties could be used as "E-1 Quiet Business," but such a classification would not result in their highest and best use. James M. East, a real estate broker, likewise agreed that the highest and best use of the real estate at issue was "F-Commercial." He said that the rezoning of the properties "would not affect the residential property in Brookfield any more than they were already affected at the time they were constructed." More specifically, Mr. East stated that the best use for the premises was for retail stores, though he did not think that a service station or "drive-in" would adversely affect the value of the homes in Brookfield Subdivision. James L. Larrison, a real estate dealer, agreed substantially with East. When asked if the existence of a service station within a proximity of a homesite would adversely affect the marketability of that homesite, he replied, "That varies with people and circumstances. I don't think you can answer that question categorically."

A number of residents of the neighborhood testified in opposition to the rezoning. Mr. and Mrs. G. W. Blankenship, who reside in Brookfield, both strenuously objected, particularly mentioning their objections to a

service station, a "Kwik-Chek," and a "drive-in." Mrs. Claudia Berthe, likewise a resident of Brookfield, who testified that she had invested about $27,000.00 in her house and lot, also vigorously objected, stating, "We have no idea what is being put in front of us. It could be a liquor store, honky-tonk, gasoline station or that quick check to which I object." Mrs. Berthe is a real estate dealer, and she said that the traffic situation would be much more difficult, and that at present "it takes 40 minutes time to unsnarl coming both ways." Mrs. Berthe testified that if the property were rezoned, "I intend to sell and get out." Curtis Glover and William Payne, residents of the area, also vigorously objected, Mr. Glover citing inconveniences of living in the near vicinity of a service station. Mr. Payne, a realtor, testified that he had also had the personal experience of living in the vicinity of a service station, and that such use of land adversely affects the market value of residential property.

C. V. Barnes, a real estate counselor, testified that, in his opinion, this particular area of the city has sufficient lands zoned commercial to meet the growth and needs of the area for the next ten years. It was his view that the highest compatible use for the properties is "E-1 Quiet Business," which would permit uses such as doctors' offices, clinics, dentists' offices, insurance offices, and others of a similar nature. He was also of the opinion that the rezoning of the premises involved would have a detrimental effect on the Brookfield Subdivision. Barnes agreed that the highest and best use of the properties would be commercial, but that this would not be the highest *compatible* use, *i.e.,* a use which takes into consideration the surrounding areas.

Russell McLean, a real estate appraiser, testified that Brookfield is a subdivision where the homeowners exhibit pride in ownership by taking care of their properties, and that, in his opinion, Brookfield would be adversely affected if appellees' petition for "F-Commercial" were granted. He was also of the view

that the highest and most compatible use would be an "E" or lower zoning classification. Henry de Noble, Director of Community Development in Little Rock, testified that the city is experiencing an extensive problem in the handling of traffic on West Markham Street in the general area involved, "especially because of traffic created by John Barrow Road and traffic going to Henderson Junior High and also the normal flow of traffic during the peak periods on West Markham, which is traveling east and west to feed into different parts of the city. But we experience our heaviest times in the afternoon when school lets out and in the morning roughly around 8:30." Mr. De Noble also stated that locating a service station on this corner would be detrimental from the standpoint of safety; that a station would add to the traffic. He further testified that, as a result of the application of appellees before the Planning Commission, his staff recommended that the lands be rezoned to "E-1 Quiet" use, and he also stated that a study reflected "that there is enough commercial zoning at this time on a two-mile circle of a point just up road from this map, which includes this area there is enough commercial zoned property available today to serve over 100,000 people," but that only about 36,-000 people could live within this radius.

Paul R. Fair, Deputy Superintendent of Schools, opposed the petition, stating, "We like residential property around the school. * * * Commercial property around the school is less desirable." Mr. Fair said that commercial property increases the traffic around a school, thus constituting a more serious safety hazard, and that commercial districts create more noise and "disruption." Mr. Fair testified that the district had applied for a Federal program to develop some of the property surrounding Henderson Junior High School as a park.

Appellees, for affirmance, rely almost entirely on *Little Rock* v. *Pfeifer,* 169 Ark. 1027, 277 S. W. 883, and they quote from that case as follows:

"There are numerous witnesses in the case, and they express various opinions as to the effect of the construction of a business house on contiguous residence property, and they also differ as to whether or not the locality should be regarded as business or residence property. Giving due effect to the statement and opinions of all the witnesses, we are of the opinion that the evidence establishes very clearly and beyond controversy that the locality in question is a business district which has been well established, and which is now expanding, the expansion having reached the point where appellees are constructing their building. There is substantial evidence tending to show that the value of some of the adjacent residence property will be depreciated on account of the lessening of usable value of the property for residence purposes, but we do not think that this affords justification for interfering with the gradual expansion of the business district, which has already been established. As the size of the business district grows, it ceases to be a residence district to that extent within the purview of the zoning ordinance, and any attempt on the part of the city council to restrict the growth of an established business district is arbitrary."

In the case before us, the court found that appellees' properties are adjacent to an existing "F-Commercial" district, and that the property is no longer desirable for residential purposes, because of its proximity to the "F-Commercial" classification. We do not think however, that the *Pfeifer* case can be relied upon to uphold the "F-Commercial" classification. *City of Little Rock* v. *McKenzie*, 239 Ark. 9, 386 S. W. 2d 697, also mentioned by appellees, will be later discussed. The statute in force at the time of *Pfeifer* was Act 6 of the Second Extraordinary Session of the General Assembly of 1924, and cities of the first class were authorized to establish zones limiting the character of buildings erected thereon. There were only three zoning classifications under that Act, one, that portion of the city where manufacturing establishments might be erected, two, those portions of

the city where business, other than manufacturing, might be carried on, and finally, those portions of the city set apart for residential purposes.[1] Act 186 of the Acts of the General Assembly of 1957, Ark. Stat. Ann. § 19-2825 (Supp. 1965) is a comprehensive act authorizing cities of the first and second class to adopt and enforce plans ''for the coordinated, adjusted and harmonious development of the municipality and its environs.'' The purposes of the act are set out in Subsection a. as follows:

''The plan or plans of the municipality shall be prepared in order to promote, in accordance with present and future needs, the safety, morals, order, convenience, prosperity and general welfare of the citizens; and may provide, among other things, for efficiency and economy in the process of development, for the appropriate and best use of land, for convenience of traffic and circulation of people and goods, for safety from fire and other dangers, for adequate light and air in the use and occupancy of buildings, for healthful and convenient distribution of population, for good civic design and arrangement, for adequate public utilities and facilities, and for wise and efficient expenditure of funds.''

The Act itself consists of nine lengthy sections, including approximately forty sub-sections, and composing fourteen pages (Acts of Arkansas 1957), all dealing with the preparation of plans for the orderly growth of a city. Included is the authority of the city council to pass proper zoning ordinances, which ''shall designate districts or zones of such shape, size or characteristics as deemed advisable.'' Section 8 provides that the provisions of the Act shall be construed liberally.[2]

---

[1] Section 3 authorized an exception to be made in a particular instance ''only for good cause, and in case of abuse the adjacent property owners shall have the right to appeal to the courts of Chancery to protect their property from depreciation by reason of the setting up of such exceptional business within the zone.''

[2] This act is a ''far cry'' from Act 6 of 1924, which consisted of five short sections, and comprised only a page and a half in the volume containing the acts of the special session of 1924.

It is apparent that the passage of Act 186 of 1957, to some degree, necessarily modified our holding in *Pfeifer*, for a strict and literal interpretation of all the language in that case would certainly result in nullifying the effort by a city to coordinate development of lands, and, more than that, in effect, would nullify Act 186. The right and responsibility for classifying the various areas in the city are with the zoning authorities, and their decision will only be disturbed if it is shown that they acted arbitrarily. *Lindsey* v. *City of Camden*, 239 Ark. 736, 393 S. W 2d 864.

The sole question before this court on this appeal is "Did the preponderance of the evidence before the Chancellor show that the city acted arbitrarily in refusing to rezone the properties here at issue as 'F-Commercial'?" While the word, "arbitrary," has several definitions, probably the most generally accepted one is, "arising from unrestrained exercise of the will, caprice, or personal preference; based on random or convenient selection or choice, rather than on reason or nature." (Webster's Third New International Dictionary, 1961) After carefully reviewing the evidence, we are of the opinion that the answer is, "No, the preponderance of the evidence does not show that the city acted arbitrarily." The testimony has been set out rather fully, and we think it clearly shows a reasonable basis for the decision by city authorities. Several property owners in Brookfield testified in opposition to the rezoning change, and this opposition was probably intensified by the fact that no definite decision had been reached by appellees as the the type of commercial business that would be placed at the location sought to be rezoned.[3]

The increase in traffic, and the fact that a junior

---

[3]At the meeting of the Board of Directors of the City of Little Rock, when the proposal for rezoning was presented, counsel for appellees stated that he could not specify the definite use of the property, if rezoned, though he did state that certain specific uses of the property would not be made.

high school is located nearby are also cogent reasons to support the city's position.

However, the fact that the city was justified in refusing to rezone to "F-Commercial" does not mean that the properties should remain within the residential classification. Appellees, as previously mentioned, cite *City of Little Rock* v. *McKenzie, supra,* in support of their contention that *Pfeifer* is controlling. In *McKenzie* we quoted *Pfeifer* as follows:

"* * * When a business district has been rightly established, the right of owners of property adjacent thereto cannot be restricted, so as to prevent them from using it as business property."

But here, we are not saying that the city would not be acting arbitrarily in refusing to rezone these properties to *any* type of business property. We are only saying that the refusal to rezone same as "F-Commercial" was not arbitrary. In fact, in *McKenzie* the east half of the property involved was rezoned from one family residential use to quiet business, and the west half was rezoned from one family residential to apartments not exceeding three stories in height. It might also be pointed out that in *McKenzie,* the City of Little Rock *approved* the rezoning (while here, it rejected it, and we simply held that the rezoning by the city was not shown to be arbitrary.

In line with what has been said, we find that the court erred in holding that the city had acted arbitrarily in refusing to rezone the involved properties as "F-Commercial," and the decree is accordingly reversed.

It is so ordered.

WARD, J., not participating.