## Weber, Appellant, *v.* Philadelphia.

Argued January 12, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*William F. Sullivan, Jr.,* with him *Obermayer, Rebmann, Maxwell & Hippel,* for appellant.

*Matthew W. Bullock, Jr.,* Second Deputy City Solicitor, with him *John B. Day,* Assistant City Solicitor, and *Edward G. Bauer, Jr.,* City Solicitor, for City of Philadelphia, appellee.

OPINION BY MR. JUSTICE JONES, February 17, 1970:

This appeal challenges the right of the City of Philadelphia (City) to reject all the bids submitted by seven bidders for the operation of a "General Concession" (excluding a so-called Stadium Club and Restaurant) at the Philadelphia sports stadium now under construction.[1]

Some time in 1965, in connection with plans for its proposed new sports stadium, the City undertook the preparation of specifications for bids for a "General Concession" contract and, in 1967, circulated to potential and prospective bidders the specifications upon which bids for such contract were to be submitted. Sealed bids were received and opened by the City on February 14, 1968. The highest bidder was Nilon Brothers Enterprises (Nilon) whose bid was to pay forty-three and nine-tenths per cent (43.9%) of the gross receipts from "General Concession" to the City. On May 3, 1968, the City's "Stadium Committee" recommended that "all bids be rejected and that new specifications be drawn up," assigning for its recommendation, *inter alia,* four separate reasons. The Procurement Commissioner, Mr. Winter, acting on behalf of the City, rejected all the bids.

On May 21, 1969, Esther Weber[2] instituted an ac-

---

[1] "General Concession" refers to the sale of food, beverages, souvenirs, etc., to persons in attendance at the stadium.

[2] Esther Weber instituted this action in the capacity of a "taxpayer." Esther Weber is a secretary in the office of appellant's counsel, and Nilon, the disappointed bidder, is paying the costs of this litigation. In view of our well-settled rule that "a disappointed bidder has sustained no personal injury which entitles him to

tion in equity in the Court of Common Pleas of Philadelphia County against the City and certain of its officials, seeking to enjoin them from further advertising for bids and to require them either (a) to award the contract to Nilon, (b) to award the contract to the highest qualified bidder as of February 14, 1968, or (c) to revoke the decision to reject all bids and to make a new decision based upon proper factors. After hearing voluminous testimony, the court below dismissed the complaint and entered a decree nisi in favor of the City and its named officials and against Esther Weber. After entry of a final decree by a court en banc, the present appeal was taken.

Although the complaint in equity, in substance, averred that the City and its officials had rejected all the bids as the result of fraud, collusion and arbitrary and capricious actions, the instant record demonstrates not even a scintilla of evidence that the said officials acted either fraudulently or collusively in rejection of all the bids. The unanimous conclusion of the court below was "that the rejection of the bids involved no fraud or collusion," and such conclusion is fully justified by the evidence of record. In fact, one of the owners of Nilon—the real party in interest in this proceeding—conceded the absence of any fraud or collusion and stated that, in his view, the City's decision to reject all bids was arrived at in good faith; his objection to the bid rejection was that it was "uninformed" and illogical.

The crux of the present controversy is whether the decision of the City to reject all bids was arrived at in

---

redress in court" (*R. S. Noonan, Inc. v. York School District*, 400 Pa. 391, 394, 162 A. 2d 623, 625 (1960)), the writer of this opinion, speaking only for himself, is of the view that Nilon is seeking to accomplish by indirection that which it could not accomplish directly. However, the result reached in this opinion is in no wise premised upon this view.

183

an arbitrary and capricious manner and contrary to "the interest of the City."

In this area of the law, certain principles are well settled and stem, in large measure, from judicial respect for the doctrine of separation of powers in government. First, it is to be presumed that municipal officers properly act for the public good (*Robinson v. Philadelphia,* 400 Pa. 80, 86, 161 A. 2d 1, 5 (1960); *Hyam v. Upper Montgomery Joint Authority,* 399 Pa. 446, 457, 160 A. 2d 539, 545 (1960)). Second, courts will not sit in review of municipal actions involving discretion, in the absence of proof of fraud, collusion, bad faith or arbitrary action equating an abuse of discretion (*Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 572, 109 A. 2d 331, 334-35 (1954); *Hyam, supra,* 399 Pa. at 457, 160 A. 2d at 545). Third, on judicial review, courts, absent proof of fraud, collusion, bad faith or abuse of power, do not inquire into the *wisdom* of municipal actions and *judicial* discretion should not be substituted for *administrative* discretion (*Goodman Appeal,* 425 Pa. 23, 30, 227 A. 2d 816, 820 (1967); *Parker v. Philadelphia,* 391 Pa. 242, 249, 137 A. 2d 343, 347 (1958)). Fourth, if a municipality, in connection with competitive bidding, is empowered to do so, it may reject any and all bids in the absence of fraud, collusion, bad faith or arbitrary action (*Highway Express Lines, Inc. v. Winter,* 414 Pa. 340, 345, 200 A. 2d 300, 302 (1964); *R. S. Noonan, Inc. v. York School District,* 400 Pa. 391, 396, 162 A. 2d 623, 626 (1960); *Straw v. Williamsport,* 286 Pa. 41, 43, 132 A. 804, 805 (1926); *American Pavement Co. v. Wagner,* 139 Pa. 623, 630-31, 21 A. 160, 161 (1891)). Fifth, the requirement of competitive bidding for municipal contracts guards against "favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts, and to secure the best work or supplies at the lowest price practicable . . . ." (*Yohe*

*v. Lower Burrell,* 418 Pa. 23, 28, 208 A. 2d 847, 850 (1965); *Price v. Philadelphia Parking Authority,* 422 Pa. 317, 332, 221 A. 2d 138, 146 (1966)).

The Philadelphia Home Rule Charter, §8-200(2) (b), provides: "Bids shall publicly be opened and tabulated in the presence of a representative of the City Controller at the time specified for their opening. *The Department may reject all bids if it shall deem it in the interest of the City so to do.* Otherwise the contract shall be awarded to the lowest responsible bidder . . . ." (Emphasis added) As we read this Charter provision, the City, in competitive bidding, is authorized and empowered to reject all bids subject only to the limitation that such rejection be "in the interest of the City," and the determination of that question is placed, at least initially, in the judgment not of the courts but of the City, for the Charter states "if it [the City] shall deem" the rejection "in the interest of the City."[3] The specifications, in response to which the instant bids were submitted, provide as follows: "The Procurement Commissioner of the City of Philadelphia reserves the right to reject any and all bids, as he may deem in the best interest of the City" (Specification No. 22).[4] All the bidders were clearly placed on notice that, under the provisions of the City Charter and under the specifications, the City had the right to reject any and all bids.

The report of the "Stadium Committee," after a review of the bids, in its recommendation for the rejection of all bids, cited four reasons:[5]

---

[3] *Cf. Cantor v. Smallwood,* 36 D. & C. 2d 625 (1964); *Fagnani v. Philadelphia,* 37 D. & C. 2d 216 (1965).

[4] In *Straw,* the Court well said: "The advertisement reserved the right to reject any or all bids or parts of bids, and that is conclusive of the question." (286 Pa. 41, 43, 132 A. 804, 805 (1926))

[5] In addition thereto, the three highest bids were so high as to raise a question as to the adequacy of the specifications, par-

"A. Specifications, as written, should assure single management of concessions and Stadium Club at a fixed income for the City. The Committee feels that this is most desirable.

"B. ... the Phillies Baseball Club management and the Eagles Football Club management should participate in the selection of the concessionaire.

"C. A provision in the specifications should state that only a concessionaire who has had experience in other stadia of this type will be acceptable.

"D. The Committee recommends that the architects study the feasibility of using gas at all concession stands."

The court below thoroughly and ably analyzed each reason assigned for the rejection of the bids.

In connection with the recommendation that specifications should assure "single management of concessions and Stadium Club at a fixed income for the City," the court below stated:

"[T]he original specifications did not include the joinder of the operation of the general concessions with that of a Stadium Club. [Weber] contests the decision to join the two operations under the one concessionaire. Stadium Clubs have, within the last four or five years, become important adjuncts of operations of this character throughout the country. A Stadium Club is a prestige type of operation wherein, according to the estimates appearing in the record, it is proposed to offer restaurant facilities together with a cocktail bar, the restaurant to provide for possibly 300 seats and the cocktail bar 100 seats. It is possible that the Club will be operated not only when athletic contests or other events are being held, but also at all other times throughout the year. Its operation could be tied

---

ticularly since the project on which the bids were solicited was comparatively novel.

in with the season tickets sold by Ball Clubs and the members will be charged dues, all of which will go to the City under the contracts with the Ball Clubs. Among its guests will be included public officials from all levels, and prominent guests from other localities, as well as the City. On the other hand the general concessions deal with the selling of food, beverages and souvenirs, etc. to the spectators outside of the Club. [Weber] does not contest the importance of the operation of this Club.

"One of the main reasons stated by [the City] for the rejection of the bids and for the joinder of the two types of concessions is that the financing of the establishment of this Club is not within the present legal financial limits the City has allocated to the Stadium. It was agreed that considerations of decor, paneling, furnishing and the other numerous requirements involved in the establishment of the Club are to be first class in every respect. Estimates of costs varied from $100,000 given by the witnesses for the plaintiff, up to 1½ million dollars by witnesses on behalf of the defendants. Whatever the sum involved it is clear that the City does not have the financial means to supply this facility. The City's position is that the financing of the construction of the Club should be taken over by the concessionaire who could amortize this cost over a period of years out of profits. The operation of the Club may or may not result in a profit and, therefore, its operation should be tied in with the general concessions which yield handsome profits. A second reason is that dual operation of the two types of concessions will require the City to do business with two separate concessionaires, whereas the operation under one concessionaire will be more convenient as to financial matters (e.g., accounting) as well as other facets of the operation including the possible interchange of

help and the reconciling of problems which are bound to arise in the operation.

"The testimony concerning the validity of the decision to combine the two types of operation was vigorously contested by [Weber] but the record sustains the decision of [the City] to reject the bids and to seek new bids based on joint operation of the two types of concession. The Court sustains the finding that these are valid reasons to support single operation and that there was no abuse of discretion in rejecting the bids and seeking bids under new specifications." We agree with this analysis and ascertain no basis for labeling this reason as arbitrary or capricious.

As to the decision of the City that the Phillies Baseball Club and the Eagles Football Club management should participate in the selection of the concessionaire, the City *alone* must ultimately determine the selected concessionaire; neither the Phillies nor the Eagles can in any way interfere with the City's *own* selection of the concessionaire. The record discloses that the City has contracts in connection with the stadium with the Phillies and the Eagles, and, of course, *consultation* with both the Phillies and the Eagles, the principal and most likely users of the stadium, would be proper and sound. However, the ultimate responsibility for the selection of the concessionaire must rest with the City, not the Phillies or Eagles. Nevertheless, despite the inartistic language employed by the Stadium Committee in stating this reason, we cannot find that the assignment of this reason for the rejection of the bids was either arbitrary, capricious or in bad faith.

Moreover, the third reason—requiring that a potential bidder must have had experience in other stadia of this type—does not appear arbitrary or unreasonable and certainly is not sufficient to justify Weber's position in this respect.

188

The fourth reason, *i.e.,* that "[t]he Committe recommends that the architects study the feasibility of using gas at all concession stands," was considered by the court below:

"The validity of this reason was contested by [Weber] on the ground that electricity is all that is needed to operate the concessions because of its great convenience and mobility of installation and operation. The proposal is tentative like other proposals. . The City indicated in its testimony that since the City owns and operates the Gas Works that it might and probably will result in its being able to negotiate a more favorable contract involving use of gas than electricity or at least to supplement each other. The City incidentally does not contend that electrical installation and operation should be excluded. Mr. Bak, an architect who is in an executive position among all of the participating architects consulted and employed by the City, testified that power of this character involves heating and air conditioning as well as the preparation of food; that the original architect's plans did not call for the use of gas at least in any appreciable quantity. However, he stated, after much consultation, that the plans have been changed so that the installation of gas facilities will be included and provided to the concessionaire as well as for other purposes. It is obvious that the different forms of fuel have their benefits as well as their hazards including the possibility of fire and power failure. The Court affirms the action of the Chancellor in concluding that this reason was a valid one for the rejection of all bids and a review of the specifications." We agree with the court below in this respect.

A careful examination of the record reveals not the slightest evidence of any fraud or collusion on the City's part which motivated the rejection of these bids. Moreover, the record is barren of any demonstration of ar-

bitrariness, caprice or lack of good faith in the rejection of these bids. Whether the City was wise in its rejection of the bids is not within our province to determine.

In passing upon the propriety of the actions of municipal officials, judicial restraint rather than judicial intervention should guide the courts. We are not a super municipal body and, in the absence of improper motivation, demonstrated of record, which prompted the actions of municipal officials, we should not interfere with such actions. Under the facts on this record, we are convinced that judicial intervention in this phase of the City's activities would not only be unjustified but unwise and improper.

Decree affirmed. Weber to pay costs.

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

The Philadelphia Home Rule Charter permitted the City to reject all bids for the concessions here involved only if such rejection was "in the interest of the City." See Home Rule Charter, §§8-200, -201. It is my view that when the City rejected the highest responsible bid for the sports stadium concessions, it violated this Charter restriction. Not only does the record in this case fail to show how the City's rejection of these bids will in any way serve or advance its interest, but, by the City's own admission, the new bids will actually provide the City with less revenue than the rejected bids. I find it difficult to understand how it is "in the interest of the City" to diminish the revenue it will receive from the concessions and I must therefore dissent.

The highly desirable aspects of sealed competitive bidding have often been emphasized by this Court. See, e.g., *Yohe v. Lower Burrell,* 418 Pa. 23, 28, 208 A. 2d 847, 850 (1965). The public interest served by such bidding is not advanced, however, if bids can be re-

jected at will or without cause, and thus the Charter provides for rejection only when it is in the City's interest. Bidders will not be willing to invest great amounts of time and money in preparing and submitting the best possible bid if their offers can be set aside without cause. For once the bids are open, competitive advantage may easily be lost. Of course there may very well be times when rebidding will offer the City significant benefits. In such instances the City would be justified in rejecting all bids, for rejection would then clearly be in the City's best interest, and in accord with the Charter.

In the instant case, however, I believe that the City has failed to demonstrate how rejection served the City's interest. The City's major justification[1] for rejection was that it would be better to have a single bid for the concessions and the stadium club,[2] thus ensuring a single operator for both. While the City did give two reasons for its assertion that it would be beneficial to have a single operator for both the concessions and the stadium club, neither demonstrates that such consolidation would truly be in the City's interest.

------

[1] Three other reasons were given when the bids were rejected: (1) the Phillies and Eagles should participate in the selection of the concessionaire; (2) the specifications should state that only a concessionaire who has had experience in other stadia of this type will be acceptable; and (3) the architects should study the feasibility of using gas at the concession stands. Reason one would not be legal; reason two was admitted by the City to be merely a "formal change;" and reason three, even if valid, makes no sense until the architects have at least considered the matter and state that only gas can be used by the concessionaires. The City, in its brief, also attempts to argue that there were other "substantial reasons" for rejecting the bids. But the City never indicated what these reasons were and I find it difficult to agree that these "reasons" warranted rejection without such knowledge.

[2] The stadium club is to be a "plush restaurant" operated as a private club, with membership open, for a fee, to Phillies' and Eagles' season ticket holders. Among the guests will be "public officials from all levels."

Robert W. Crawford, Recreation Commissioner and a member of the Stadium Committee, testified that the only way the City could get bids for the stadium club was to have it bid with the concessions. He asserted that nobody would bid for the club alone, since the City was "unwilling" to equip it, and since the club could not, out of its own receipts, finance the cost of equipment.[3] If the club were combined with the lucrative concessions, however, the City could be sure of bidders. Mr. Crawford then freely admitted the obvious—that the result of including the club with the concessions would mean lower revenues for the City, since the operator would have to cover the costs of the club by taking it out of the City's profits from the concessions. In other words, the City would still be paying for the club, but indirectly, through reduced revenues from the concessionaire.[4] Mr. Crawford stated: "We don't have the money to put it [the club] up. I think if we had the money it would be better . . . but we don't have it and we cannot go back and ask the tax-

---

[3] Mr. Crawford testified that the Stadium Committee "didn't get any real facts or concrete figures of what the [stadium] clubs cost. We just knew generally what the cost would be." He did estimate, however, that the club would probably cost about one million dollars to equip. Mr. Otto Winter, Procurement Commissioner, guessed that "a half a million dollars would do it." Mr. David Lagerstedt, who for two and one-half years managed the stadium club at Yankee Stadium, testified that a club would cost between $200,000 and $350,000.

[4] It is highly possible that a single bid may not satisfy the Home Rule Charter. As I have noted, the City through reduced revenue, will be paying for the costs of furnishing the club. Section 8-200 provides that contracts for purchasing equipment must be awarded to the lowest responsible bidder. Under the unified bidding arrangement presently envisioned by the City, however, it may not be possible to determine whether the concessionaire who is the highest bidder for the concession (§8-201) will also be the lowest bidder for furnishing the club (§8-200).

payers for another bond issue, so we have to work out other solutions and that is what we were trying to do."

Surely rejection of the bids for the above reason is not truly in the interest of Philadelphia. The taxpayers have the right to know how much their stadium is costing. They have already approved bond issues limiting expenditures. If the City feels the club is so important to the stadium, the taxpayers can be asked to approve more bond issues. It is not up to City officials to indirectly finance a stadium club by accepting reduced concession receipts. Techniques designed to hide from public view costs of public projects are hardly "in the interest of the City."

The second theory was advanced by Harry Blatstein, executive secretary of the Stadium Committee. He stated that the cost of the club, equipment and furnishings had *no* bearing on the decision to reject the bids. The Committee, in his view, decided on joint biddings because joint control would be more efficient. But the City submitted little beyond this general assertion.[5] Mr. Blatstein testified that after the bids were received he talked to only one or two other stadia to see how their clubs were run. He also conceded that a separate set of books for the concessions and the stadium club would still be required.[6] On the other hand, plaintiff produced expert witnesses who testified that the concessions and stadium clubs in St. Louis, Minneapolis, Washington, D.C., and San Francisco are under separate management.

---

[5] For example, Mr. Blatstein asserted that a unified management might lead to an interchange of help. Mr. Lagerstedt, however, testified that the duties of the personnel are "99% completely different" and that the unions at Yankee Stadium and Minneapolis made it impossible to switch any employees.

[6] The leases executed between the City and the ball clubs give the clubs 15% of the gross receipts from general concessions, but nothing from the stadium club.

Whatever the merits of unified or separate management may be, the testimony adduced at trial does not indicate that one form of management is inherently superior to the other. Philadelphia did not insist on unified management and decided to have the club and concessions bid separately. This decision was originally made in 1965, some three years before the bids were rejected. There is evidence that the specifications were carefully considered before bids were invited.[7] Yet the City made its decision to reject all bids, some three months after they were received, based on what appears to be no more than a mere belief that a single concessionaire would be a good idea. This, in my view, is not sufficient proof that rebidding would be "in the interest of the City." In fact, if we accept the City's view that the stadium club will be unprofitable, a single bid will lower revenues and be *against* the City's interest.

Neither the efficiency theory nor the financing theory can support the City's actions here. Since the City has not in any way demonstrated how its interest would be advanced by rejecting all bids, I feel that the decree of the court en banc, entering judgment for the defendant, should be reversed. Accordingly, I dissent.

---

[7] Mr. Winter testified that investigations began in 1965 and that the City "did a lot of investigating before we started to prepare them." A 1967 memorandum from Mr. Winter to the Deputy Managing Director indicates that several City agencies had reviewed the specifications and that their suggestions were incorporated into the specifications which were bid upon.