885 P.2d 628

**PLANNING AND DESIGN SOLUTIONS,**
Petitioner–Appellee/Cross Appellant,

v.

**CITY OF SANTA FE, Respondent–**
Appellant/Cross–Appellee.

No. 21387.

Supreme Court of New Mexico.

Oct. 25, 1994.

Gerald Gonzales, City Atty., Dianne De-Layo, Deputy City Atty., Santa Fe, for appellant.

Sommer, Fox, Udall, Othmer & Hardwick, Craig Othmer, Santa Fe, for appellee.

*OPINION*

FROST, Justice.

The City of Santa Fe (City)[1] solicited bids for a proposed·development. After the bids had been opened, the City introduced new criteria in evaluating the bids, then awarded the bid to the fourth-ranked bidder, and then rejected all bids. Planning Design Solutions (PDS), the top-ranked bidder, sued the City, alleging violations of the New Mexico Procurement Code and the City's own purchasing regulations. The trial court ruled that PDS was entitled to damages for costs incurred in preparing the bid. We affirm.

## I. FACTS

On April 15, 1992 the City published a "Request for Proposal" to solicit bids for the professional services necessary for developing a mixed-use community. *See* City of Santa Fe, *Request for Proposal[:] Master Plan Development—Tierra Contenta Site* (April 15, 1992) [hereinafter *Request*]. The *Request* listed and weighted four factors the City would use in evaluating the proposals: 25% for project approach, 10% for project schedule, 30% for the experience and expertise of the firm, and 35% for the experience and expertise of the assigned personnel. There was no suggestion in the *Request* that locality would be a factor—that preference would be given to proposals that included the

use of people and resources from New Mexico.

The City received eleven proposals. These were evaluated by a selection committee which determined that PDS, a California corporation, submitted the proposal "most advantageous to the City." Santa Fe, N.M., Purchasing Manual § 23.14.4 (May 25, 1988) [hereinafter Purchasing Manual]. The bid submitted by Mazria and Associates, a New Mexico firm, was ranked fourth. Contract negotiations ensued between PDS and the purchasing agent of the City. On June 29, 1992 a proposed contract between PDS and the City was approved unanimously by the City of Santa Fe Finance Committee. However, the approval of the Santa Fe City Council was necessary before the contract could be ratified. On July 8, 1992 the proposed contract between PDS and the City was presented to the City Council. The Council rejected the recommendations of the selection committee and the Finance Committee and voted unanimously to award the contract to Mazria, "the highest local firm on the list." *Minutes of the Regular Meeting of the Governing Body [of Santa Fe, New Mexico]* 9, 20 (July 8, 1992, afternoon session) [hereinafter *Council Minutes*] (statement of Councilor Deborah Jaramillo).

PDS filed a bid protest against the City on July 16, 1992. On petition from PDS, the district court on July 20, 1992 preliminarily enjoined the City from awarding the contract to any business other than PDS. On July 29, 1992 the Council rescinded the contract award to Mazria and voted to reject all eleven proposals. They further decided to reissue the *Request* with a change in the evaluation criteria to include locality. The City filed a motion for summary judgment. The district court denied the motion in part stating that the City had violated its own Purchasing Manual and ruled that PDS should be awarded its costs in preparing the bid; and it granted the motion in part stating that the City did not have a binding contract with PDS and could not be held liable for breach of contract.

1. We use the term "City" collectively in referring to the actions of the purchasing agent, the selection committee, the Finance Committee, the City Council, and any other agents of the City of Santa Fe whose conduct affected the matter before us.

## II. STANDARD OF REVIEW

We presume that municipal officers have acted in good faith and for the public good. *Regional Scaffolding & Hoisting Co. v. City of Philadelphia*, 593 F.Supp. 529, 535 (E.D.Pa.1984) (quoting *Weber v. City of Philadelphia*, 437 Pa. 179, 262 A.2d 297, 299 (1970)). When rules and statutes grant discretion to municipalities in performing specific acts, we will not question those acts absent proof of fraud, illegality, collusion, bad faith, arbitrary action, or abuse of power. In other words, we will not substitute judicial discretion for municipal administrative discretion. 10A Eugene McQuillin, *The Law of Municipal Corporations* § 29.123, at 160 (3d ed. 1990); *see Regional Scaffolding*, 593 F.Supp. at 535 (quoting *Weber*, 262 A.2d at 299). This deference is grounded in "judicial respect for the doctrine of separation of powers in government." *Regional Scaffolding*, 593 F.Supp. at 535 (quoting *Weber*, 262 A.2d at 299).

However, when statutes and regulations define the rules of competitive bidding, these statutes and regulations will be strictly construed against the government entity that solicited the bids. *K.L. Conwell Corp. v. City of Albuquerque*, 111 N.M. 125, 129, 802 P.2d 634, 638 (1990). Also, public works contracts involving a municipality will be interpreted under the same rules that govern contracts involving private citizens. *Id.* at 129, 802 P.2d at 638.

## III. THE CITY VIOLATED THE PROCUREMENT CODE AND ITS OWN PURCHASING MANUAL

### A. The procurement process

Purchasing by public entities in New Mexico is governed by the Procurement Code, NMSA 1978, §§ 13–1–28 to –199 (Repl. Pamp.1992 & Cum.Supp.1994) [hereinafter Code]. As required by Section 13–1–117.1, the City of Santa Fe has also adopted its own procurement regulations which are published in the Purchasing Manual. The Code applies to all nonfederal expenditures "by state agencies and local public bodies for the procurement of items of tangible personal property, services and construction." Section 13–1–30. In resolving this matter we must compare the City's conduct with the strictures of the Code and the Purchasing Manual.

"The purposes of the Procurement Code are to provide for the fair and equitable treatment of all persons involved in public procurement, to maximize the purchasing value of public funds and to provide safeguards for maintaining a procurement system of quality and integrity." Section 13–1–29(C). Of all the interests involved in competitive bidding, the public interest is the most important. *State ex rel. Educational Assessments Sys., Inc. v. Cooperative Educ. Servs. of N.M., Inc.*, 115 N.M. 196, 201, 848 P.2d 1123, 1128 (Ct.App.1993). An economical and efficient system of procurement directly benefits taxpayers. *See Id.* at 201, 848 P.2d at 1128. Through competitive bidding the municipality hopes to obtain the best product at the best price. *See John J. Brennan Constr. Corp. v. City of Shelton*, 187 Conn. 695, 448 A.2d 180, 184 (1982). Thus the Code protects against the evils of favoritism, nepotism, patronage, collusion, fraud, and corruption in the award of public contracts. *Id.* It is certainly in the public interest that the City abide by the procurement rules it has set for itself.

Through the initial stages of the procurement process the City complied with the requirements of the Code and the Purchasing Manual. The City's *Request* was issued in accordance with Section 13–1–112(A) of the Code:

> Competitive sealed proposals, including competitive qualifications-based proposals, shall be solicited through a request for proposals which shall be issued and shall include the specifications for the services or items of tangible personal property to be procured, all contractual terms and conditions applicable to the procurement, the location where proposals are to be received and the date, time and place where proposals are to be received and reviewed.

As mentioned above, the *Request* listed "the relative weight to be given to the factors in evaluating proposals." Section 13–1–114. Locality is a criterion which the City may

legitimately consider when evaluating proposals:

> The selection committee shall select, ranked in the order of their qualifications, no less than three businesses deemed to be the most highly qualified to perform the required services, after considering the following criteria together with any criteria, except price, established by the using agency authorizing the project:
>
> ....
>
> (4) proximity to or familiarity with the area in which the project is located; [and]
>
> (5) the amount of design work that will be produced by a New Mexico business within this state....

Section 13–1–120(B)(4) & (5). But locality was not one of the four weighted factors listed by the *Request. See Request* 20. PDS claims to have specifically inquired whether local firms would receive preference and was verbally informed they would not.

Based on the four factors and other requirements in the *Request,* PDS submitted a "responsive bid" which conformed "in all material respects to the requirements set forth in the invitation for bids." Section 13–1–84. The bids were ranked by a selection committee appointed to evaluate this specific project. *See Request* 4.

Many procurement codes in other jurisdictions require that a contract award be made to the "lowest responsible bidder who complies with the advertised proposals." *See* 10 McQuillin, *supra,* § 29.73, at 496. The City, however, may award a contract to "the responsible offeror or offerors whose proposal is *most advantageous to the City,* taking into consideration the evaluation factors set forth in the request for proposal." Purchasing Manual § 23.14.1 (emphasis added). After considering the criteria in the *Request,* the selection committee ranked PDS's bid as the one most advantageous to the City.

A contract was negotiated between PDS and the "designee of [the] local public body"—the purchasing agent of the City. *See* § 13–1–122; Purchasing Manual § 23.14.2. The recommended contract was submitted to and unanimously approved by the Santa Fe Finance Committee. *See Min-*utes of the City of Santa Fe Finance Committee 16–19 (June 29, 1992); Purchasing Manual § 23.14.3. Finally, "the proposals submitted and the recommendation of award" were brought before the Santa Fe City Council for final consideration. *See* Purchasing Manual § 23.14.4. Up to this point, the City adhered to the requirements of the Code and the Purchasing Manual.

## B. Introducing the locality requirement and awarding the contract to the fourth-ranked bidder

In considering the contract with PDS, the City Council, as prescribed by the Purchasing Manual, could have responded to the recommended contract in one of six different ways: the Council could have approved it, tabled it, appointed a new selection committee, renegotiated the contract, disqualified the top-ranked bidder based on new information, or rejected all bids and readvertised for proposals. Purchasing Manual § 23.14.4. However, at its July 8, 1992 meeting the City Council did none of these things. Rather it committed two unlawful acts: it introduced a new factor—locality—in evaluating the proposals, and it awarded the contract to Mazria, the fourth-ranked bidder.

The Code indicates that, in evaluating the eleven proposals, the City was required to apply the factors listed in the *Request*—and no others.

> The award shall be made to the responsible offeror or offerors whose proposal is most advantageous to the local public body or legislative agency respectively, taking into consideration the evaluation factors set forth in the request for proposals.

Section 13–1–117.1(B). The City's own regulations restrict its consideration of proposals even more explicitly: "No criteria may be used in proposal evaluations that are not set forth in the request for proposal." Purchasing Manual § 23.14.1. Despite this clear rule, the City Council introduced the locality requirement. Its express concern was that the City should "make the expertise we have at home work for this project." *Council Minutes* 8–9 (statement of Councilor Deborah Jaramillo).

The award of the contract to Mazria was unlawful. The City was required to accept the bid most advantageous to the City, and it was forbidden from rejecting that bid and accepting another. *See* 10 McQuillin, *supra*, § 29.77, at 521; *see also id.* § 29.73, at 496–97 ("[A]n award to other than the lowest bidder is prima facie erroneous and illegal."). The Purchasing Manual does state that, rather than approving the recommended contract, the City may "[m]ake known information not available or not considered by the selection committee which would disqualify the top-rated firm." But the "[a]ward may then be to the next rated firm, in descending order." Purchasing Manual § 23.14.4(d). This provision probably contemplates a situation like that of *Conway Corporation v. Construction Engineers, Inc.*, 300 Ark. 225, 782 S.W.2d 36, 40 (1989) (city rejected low bid in good faith where previous experiences with low bidder were termed a "fiasco"), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990). Nothing authorized the City to skip from the first to the fourth-ranked bidder.

The City correctly argues that it may adopt new criteria after receiving bids. But it must do so properly. The Purchasing Manual provides that *after* the City has rejected all proposals it may "order the request for proposal be re-advertized" and order a "[c]hange in the evaluation criteria" that will "be incorporated into the request for proposal." Purchasing Manual § 23.14.4(e)(2). The City did not follow this orderly progression.

The City changed the rules in the middle of the game. PDS was misled because the City did not reveal the true weight it intended for the locality factor. PDS claims it would have completely restructured its proposal had it known the locality factor would be so significant.

## C. The rejection of all bids

■ The City attempted to rectify the situation during the July 29, 1992 City Council meeting by rescinding the Mazria contract and rejecting all bids. This, however, did not cure its previous unlawful actions. As we have indicated, if it so chose, the City had the legal authority to reject all the bids, but not under the circumstances presented here. Purchasing Manual § 23.14.4(e); NMSA 1978, § 13–1–131 ("An invitation for bids, a request for proposals or any other solicitation may be canceled or any or all bids or proposals may be rejected in whole or in part when it is in the best interest of the state agency or a local public body."); 10 McQuillin, *supra*, § 29.77, at 520 ("If the authorities are so empowered, they may reject all bids."). But the City rejected all bids *after* accepting the Mazria bid.

■ The City cites the Kentucky opinion *Ohio River Conversions, Inc. v. City of Owensboro* for the proposition that "municipalities have wide discretion in the exercise of acceptance or rejection, and where they reserve the right to reject, the courts will not disturb their actions based on mere technicality, even if made unwisely or under mistake." 663 S.W.2d 759, 761 (Ky.Ct.App. 1984). In that case the municipality solicited bids for the purchase of a city-owned boat dock. Upon learning that the highest bidder intended to remove the boat dock to another city leaving some of the Owensboro boating public without space to harbor their craft, the municipality accepted the bid of the second-highest bidder. The highest bidder sued for specific performance. The court found that the municipality did not violate the procurement code. There is nothing in *Ohio River* that excuses the conduct of the City in the case before us. While it is true that a municipality has "wide discretion" to accept or reject offers, that discretion does not include unlawful departure from its own rules and state procurement statutes.

The City also offers *Weber v. City of Philadelphia*, 437 Pa. 179, 262 A.2d 297 (1970), as support for its rejection of all the bids. In *Weber* the City of Philadelphia solicited bids for a "General Concession" contract for a proposed sports stadium. Sealed bids were received and opened. Upon the recommendation of Philadelphia's "Stadium Committee," all bids were rejected and new specifications were drawn up. *Id.* at 298–99. The Philadelphia Home Rule Charter, § 8–200(2)(b), permits the rejection of all bids if it is "in the interest of the City so to do." 262

A.2d at 300. The highest bidder brought suit to rescind the rejection and enjoin further solicitation for bids. *Id.* at 299. The Pennsylvania Supreme Court stated that it would uphold the rejection of the bids "in the absence of fraud, collusion, bad faith or arbitrary action" on the part of the City. *Id.* The court found these factors absent. *Id.* at 302. The facts indicated that the City's conduct was sensible and in good faith. For example, the original solicitation did not include a proposal to join the operation of general concession stands with the operation of the more prestigious Stadium Club. *Id.* at 300.

The situation in *Weber* would have been quite different had Philadelphia acted like the City of Santa Fe by considering bids, introducing a new evaluation factor, accepting the fourth-ranked bid, and then rejecting all bids. No one disputes that the City has authority to reject all bids. But it must do so in a fair manner as specified by the Code and the Purchasing Manual. In *Weber* there was no suggestion that Philadelphia failed to follow its own rules in rejecting all the bids it had received. The cases cited by the City do not support its arguments.

**D. The City's conduct was arbitrary and capricious**

 The City's conduct in this matter was arbitrary and capricious. It could not evade the Code and the Purchasing Manual "under the color of a rejection." 10 McQuillin, *supra*, § 29.77, at 521. As defined by various courts the words "arbitrary" and "capricious" are used synonymously. *Cf. Webb v. Dameron*, 219 S.W.2d 581, 584 (Tex.Civ. App.1949). In New Mexico they are frequently combined into a single term "arbitrary and capricious." *See, e.g., Behles v. New Mexico Pub. Serv. Comm'n (In re Timberon Water Co.)*, 114 N.M. 154, 156, 836 P.2d 73, 75 (1992); *Snyder Ranches, Inc. v. Oil Conservation Comm'n*, 110 N.M. 637, 639, 798 P.2d 587, 589 (1990).

An arbitrary and capricious act is a "willful and unreasonable action, without consideration and in disregard of facts or circumstances." *McDaniel v. New Mexico Bd. of Medical Examiners*, 86 N.M. 447, 449, 525

P.2d 374, 376 (1974) (quoting *Smith v. Hollenbeck*, 48 Wash.2d 461, 294 P.2d 921, 293 (1956)); it is one "lacking a standard or norm," *Webster's Third New International Dictionary of the English Language Unabridged* 333 (3d ed. 1976) [hereinafter *Webster's Third* ]. Because the City departed from the explicit statutory standards of the Code and the Procurement Manual and was "not governed by any fixed rules," *City of Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 423 N.E.2d 1095, 1097 (1981) (quoting *Black's Law Dictionary* 96 (5th ed. 1979)), it acted without an "adequate determining principle," *United States v. Carmack*, 329 U.S. 230, 246 n. 14, 67 S.Ct. 252, 259 n. 14, 91 L.Ed. 209 (1946) (quoting *Funk & Wagnalls New Standard Dictionary of the English Language* —— (1944)).

Introducing the locality requirement in the last stage of the bidding process was an unrestrained volitional act on the part of the City Council. *See City of Little Rock v. Parker*, 241 Ark. 381, 407 S.W.2d 921, 924–25 (1966); *Webb*, 219 S.W.2d at 584 (stating that an arbitrary act is one "depending on the will alone"). In short, the City's conduct when viewed in light of the whole record did "not have a rational basis." *Perkins v. Department of Human Servs.*, 106 N.M. 651, 655, 748 P.2d 24, 28 (Ct.App.1987); *see Webster's Third* 110 ("based on random or convenient selection or choice rather than on reason or nature."). We hold that all the acts in question by the City—introducing a locality requirement after the bids were opened, awarding the contract to the fourth-ranked bidder, and rejecting the proposals after making a contract award—were arbitrary and capricious. Had the City simply rejected all proposals at any point before making an award, this matter would not be before us.

 In the abstract it may seem inconsequential that the City didn't follow the procurement rules in the right order: it should have rejected all the bids *and then* introduced the locality requirement instead of the other way around. But the City's conduct has very serious implications. The Code and the Procurement Manual are designed to preclude even the *appearance* of impropriety. By its actions the City defeated the "object

and integrity of the competitive bidding process." *Spiniello Constr. Co. v. Town of Manchester*, 189 Conn. 539, 456 A.2d 1199, 1201 (1983); *cf.* 10 McQuillin, *supra*, § 29.77, at 521 ("In exercising the power to reject any or all bids, and proceeding anew with the awarding of the contract, the officers cannot act arbitrarily and capriciously."). The conduct of the City warrants our review of this matter. *See Spiniello*, 456 A.2d at 1201; 10 McQuillin, *supra*, § 29.123, at 160. We now consider the question of damages.

## IV. PDS ENTITLED TO MONETARY DAMAGES

■■■■■ All parties acknowledge that no formal contract was concluded between the City and PDS. A request for bids "is not an offer but a request for offers" and bidders are making offers when they submit bids. Restatement (Second) of Contracts § 28 cmt. c (1979); *see also id.* § 26. No contract occurs until acceptance by the party that solicited bids. *S.S.I. Investors Ltd. v. Korea Tungsten Mining Co.*, 80 A.D.2d 155, 438 N.Y.S.2d 96, 99 (1981), *aff'd*, 55 N.Y.2d 934, 449 N.Y.S.2d 173, 434 N.E.2d 242 (1982). The fact that no formal contract was concluded between PDS and the City, however, does not foreclose consideration of whether the City is liable to PDS for its costs in preparing the bid.

### A. Breach of implied contract

■■■■■ Under the Code, the City has a duty to treat all bids fairly and equitably. Section 13–1–29(C); *see also Heyer Prods. Co. v. United States*, 147 Ct.Cl. 256, 177 F.Supp. 251, 252 (1959) (*Heyer II* ). In fact, by requesting proposals, the City entered into an implied or informal contract that it would "fairly consider each bid in accordance with all applicable statutes." *Nielsen & Co. v. Cassia and Twin Falls County Joint Class A Sch. Dist. 151*, 103 Idaho 317, 319, 647 P.2d 773, 775 (Ct.App.1982); *see also Swinerton & Walberg Co. v. City of Inglewood*, 40 Cal. App.3d 98, 114 Cal.Rptr. 834, 837 (Ct.App. 1974) (allowing recovery if the municipal authority breached "an informal contract (requiring neither assent nor consideration) ... to award the public works contract to ...

'the lowest responsible bidder' "); *Paul Sardella Constr. Co. v. Braintree Hous. Auth.*, 3 Mass.App.Ct. 326, 329 N.E.2d 762, 767 (1975) ("Many courts have held that it is an implied condition of every invitation for bids issued by a public contracting authority that each bid submitted pursuant to the invitation will be fairly considered in accordance with all applicable statutes."), *aff'd*, 371 Mass. 235, 356 N.E.2d 249 (1976); *School Bldg. Comm. v. Commercial Union Ins. Co.*, 37 Mass.App. Ct. 911, 638 N.E.2d 499, 500 (1994) (invitation to bid upon certain conditions creates implied contract limiting bid solicitor to those conditions).

As with any contract, this implied contract "imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1979); *see also Watson Truck & Supply Co. v. Males*, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990).

> The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract.

*Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438, 872 P.2d 852, 856 (1994) (citation omitted).

The duty of good faith and fair dealing in the bidding process required that the City abide by the strictures of the Code and the Purchasing Manual. Specifically, the criteria provided by the City were an implied contract that if any bids were accepted, the acceptance would be based on those criteria and no others. PDS had every reason to believe that the City would not violate its own rules. The City, on the other hand, could not have been unaware that preparation of a bid on a multi-million dollar project would involve numerous foreseeable expenditures on the part of the bidder including travel, graphic and textual reproduction, labor, shipping and mailing, electronic communication, consulting services, secretarial services, and other professional services. PDS *relied* on a guarantee that any award would be based only on the four criteria published

in the *Request*. It changed its position by "incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts." Restatement (Second) of Contracts § 344 cmt. a (1979). Had the city made a different guarantee—that locality would be a criterion for example—PDS's expenditures would have been different. It might have chosen not to bid at all.

■■■ By unlawfully introducing, considering, and relying on a criterion not listed in the *Request*, the City breached an informal contract that·it would follow the Code and the Purchasing Manual in considering each bid. *See Sardella*, 329 N.E.2d at 767. Thus, though no formal contract was ever concluded between the parties, the City's conduct was a breach of an implied contract for which damages will lie.[2] *Cf.* 10 McQuillin, *supra*, § 29.123.10, at 162 ("The municipality may also be held liable in damages for misrepresenting specifications in its advertisement for bids.").

## B. Reliance damages

■■■ Judicial relief is available to the disappointed bidder when a municipality acts in an arbitrary and capricious manner and violates the integrity of the Code. *Spiniello*, 456 A.2d at 1202; 10 McQuillin, *supra*, § 29.86, at 549; *see also Educational Assess-*

*ments*, 115 N.M. at 200–01, 848 P.2d at 1127–28 (discussing federal laws that provide remedies for disappointed bidders). It is not reasonable at this point to enforce the City's promise to award the contract to the top-ranked bidder. *See Swinerton*, 114 Cal.Rptr. at 838. Also, under the circumstances, injunctive relief is pointless. *Nielsen*, 103 Idaho at 319, 647 P.2d at 775.

We believe the appropriate remedy is reliance damages. These damages compensate the bidder's "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made." Restatement (Second) of Contracts § 344(b) (1981). We therefore join other jurisdictions that in similar situations have awarded to the disappointed bidder the expenses incurred in preparing and submitting a bid. *Nielsen*, 103 Idaho at 319–20, 647 P.2d at 775–76 (allowing damages for time expended, overhead, and attorney fees on trial, but denying lost profit damages and attorney fees on appeal); *State Mechanical Contractors, Inc. v. Village of Pleasant Hill*, 132 Ill.App.3d 1027, 87 Ill.Dec. 532, 536, 477 N.E.2d 509, 513 (denying lowest responsive bidder damages for lost profits but permitting recovery of expenses incurred in preparing proposal when contract was awarded to

2. Very similar to the breach of implied contract theory is the doctrine of promissory estoppel. This doctrine has been used by courts to justify relief when no formal contract was concluded between a bidder and a government entity. *See Swinerton*, 114 Cal.Rptr. at 838 (holding that lowest responsible bidder had a cause of action based on promissory estoppel when contract was awarded to second lowest bidder because advertisement for bids constituted a promise to award contract to lowest responsible bidder).

Restatement (Second) of Contracts § 90(1) (1981), provides the basic formulation of promissory estoppel:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

The concepts of promissory estoppel and breach of implied contract, however, tend to blur into one another as demonstrated by comment

(d) of the same section of the Restatement: "A promise binding under this section is a contract." *Id.* § 90 cmt. d (1981).

The distinction between a promise and an implied or informal contract may be academic in some situations and is certainly not carefully drawn by all courts. For example, *Swinerton* quotes the Restatement of Contracts Section 90 (1932): "A *promise* which the *promisor* should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the *promisee* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the *promise*." 114 Cal.Rptr. at 837 n. 7 (emphasis added). The court then states that "[i]f the requirements of the Restatement section have been met in the instant case, an *informal contract* (requiring neither assent nor consideration) ... resulted." *Id.* at 837 (emphasis added) (citing Restatement of Contracts § 85 (1932)).

We feel that in this case, the promissory estoppel doctrine is not clearly distinct from implied contract theory. The line of reasoning under the latter theory seems more simple and direct.

nonresponsive bidder), *appeal denied,* 108 Ill.2d 590, 91 Ill.Dec. 401, 483 N.E.2d 887 (1985); *Swinerton,* 114 Cal.Rptr. at 838 (limiting bidder's damages "to the expenses it incurred in its fruitless participation in the competitive bidding process"); *Sardella,* 329 N.E.2d at 767 ("proper measure of recovery is the reasonable cost of preparing the bid").

The public has both economic and moral interests in assuring that government entities strictly adhere to the Code as well as their own published regulations. *Swinerton,* 114 Cal.Rptr. at 838. An award of money damages serves these interests. Future misconduct will be deterred by holding public entities accountable for their violations. *Id.; see also Sardella,* 329 N.E.2d at 767. Also, if bidders sense that the procurement process is inherently unfair—that the cards are stacked against them—they might forgo the bidding process and look to other sources of business. This would reduce the number of quality bidders and limit the choices available to the government entity. *Sardella,* 329 N.E.2d at 767–68 (quoting *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 140 F.Supp. 409, 412 (1956) (*Heyer I*), *modified,* 177 F.Supp. at 251 (1959)); *See also* Richard E. Speidel, *Judicial and Administrative Review of Government Contract Awards,* 37 Law & Contemp. Probs. 63, 67–68 (1972) ("[I]f a pattern of award decisions exists which seem to deviate from the 'rules of the game' and there is no effective way to improve or reverse the pattern, a realistic cost-benefit analysis might induce many firms to stop or cut back competition for government business and reallocate resources to other commercial markets."). Strict enforcement of procurement laws and penalties for their violation will serve the public interest in the widest competition among the greatest number of responsible bidders. *Sardella,* 329 N.E.2d at 767 (bidder whose award was rescinded in violation of statutory requirements).

## V. CONCLUSION

We therefore agree with the district court that the City did violate its own Purchasing Manual rules. We concur that there was no formal contract between PDS and the City, but we do find an implied contract that the City would consider the bids in accordance with the Code.

After the partial summary judgment order the parties in this case filed a joint motion requesting the trial court to determine PDS's bid preparation costs. Upon reviewing affidavits filed by the parties, the court determined PDS's reasonable preparation costs to be $25,769.93. The trial court's determination of that sum is supported by substantial evidence. We therefore affirm the trial court's judgment for that amount.

**IT IS SO ORDERED.**

RANSOM and MONTGOMERY, JJ., concur.