## Clarkie's, Inc. v. City of Philadelphia

*R. Max Bockol,* for plaintiffs.

*Alfeo P. Libetti,* Assistant City Solicitor, for defendants.

SPORKIN, J., October 29, 1973.—This case comes before the court on a complaint in equity filed by plaintiffs Clarkie's, Inc. (Clarkie's) and Milton Clark (Clark) against defendants, Otto Winter (Winter), Lloyd J. Vye (Vye) and the City of Philadelphia (city).

Plaintiffs, in their prayer for relief seek to enjoin defendants, their agents, employes and all persons acting in concert with them from "making an award of the contract for the janitorial and maintenance services for Veterans' Stadium to Building Maintenenace Services, Inc. for the period from April 1, 1973 to March 31, 1974" and from "making an award of the above contract without having a resubmission of bids based upon factors which are relevant to the services to be performed . . ." Plaintiffs further pray for the court to issue an order "enjoining defendants, their agents, employees and all persons acting in concert with them from arbitrarily, collusively and unreason-

ably placing specifications into invitations to bid on City contracts which by their inclusion prohibit competitive bidding as prescribed by the Philadelphia Home Rule Charter"; "that defendants be directed to award the bid on the contract for the janitorial and maintenance services for Veterans' Stadium for the period from April 1, 1973 to March 31, 1974 to plaintiff Clarkie's Inc."; awarding plaintiff Clarkie's Inc., its damages for its "loss of profits for the three contract periods as averred above due to defendants' unreasonable and arbitrary disqualification of them as responsible bidders"; "awarding plaintiffs their costs in this action"; and "awarding such other relief as the Court may deem appropriate."[1]

Testimony was presented and argument heard on February 15, 1973, and on February 21, 1973, and briefs were subsequently filed. Upon consideration of the pleadings, of the notes of testimony, of the briefs and arguments of counsel, we make the following:

## FINDINGS OF FACT

1. Plaintiff Clarkie's is a Pennsylvania corporation

---

[1] It is pertinent to note that the case came to trial only weeks before the Philadelphia Phillies' baseball season was scheduled to begin. It was, therefore, obvious that under such circumstances the award of the contract for April 1, 1973, to March 31, 1974, could not be enjoined without drastic results (due to the shortness of time) for to do so would have left the stadium without maintenance or janitorial services during the baseball season, for the potentially lengthy period necessary to allow alternative specifications to be drawn and new bids to be submitted. Plaintiffs, therefore, agreed to eliminate from their prayer for relief, injunctive action by the court relative to the contract for April 1, 1973, to March 31, 1974; plaintiffs limited themselves to a prayer for removal of the proof-of-competency specifications from future invitations to bid, and to a prayer for damages consisting of alleged lost profits resulting from the rejection of plaintiffs' bid for April 1, 1973, to March 31, 1974.

engaged in the business of providing maintenance and janitorial services on large projects.

2. Plaintiff Clark is an individual taxpayer residing in the City of Philadelphia, and has been the president of Clarkie's during the entire period in question.

3. The individual defendants are officers or agents of the city as follows: Winter is Procurement Commissioner and Vye is Deputy Recreation Commissioner.

4. Defendants have, for the past three years, issued invitations to bid on proposed contracts with the city for janitorial and maintenance services in regard to the city's Veterans' Stadium and John F. Kennedy Stadium (the stadia) for the following periods:

(a) April 1, 1971, through March 31, 1972 (period I);

(b) April 1, 1972, through March 31, 1973 (period II);

(c) April 1, 1973, through March 31, 1974 (period III).

5. The work to be done under the contract included after-event cleaning and general cleaning incident to a small number of events at John F. Kennedy Stadium. The great bulk of the work to be done under the contract would be performed at Veterans' Stadium.

6. In each of the three years, defendants required of the bidders as proof of competence that "the bidders have satisfactorily performed the required services at one Stadium, Arena or Race Track with a seating capacity of at least (10,000 people in periods I and II, and 20,000 in period III) for a minimum of one year." (Parenthetical insertion supplied).

7. The city's reasoning in drawing its proof-of-competency specifications was that such specifications would insure retention of a maintenance firm which had had experience with each of the crucial factors involved in cleaning the stadia, namely: (a) Prior

maintenance experience working outside in the elements; (b) prior maintenance experience working under a rapid deadline; (c) experience meeting the problems involved in having to rapidly recruit extra labor; and (d) experience dealing with fluctuations in attendance at the facility to be cleaned.

8. In each of the three periods, Clarkie's has met all requirements set forth in the city's invitation to bid with the exception of the proof-of-competency specification; Clarkie's was qualified by prior experience to perform the *tasks* involved in the contract, but did not meet the technical standard in the proof-of-competency specification of having had experience in a stadium, race track or arena with a seating capacity of at least 10,000.[2]

9. Clarkie's has also had extensive experience with each of the *factors* that caused the city to require prior experience in the maintenance of an athletic facility, gaining this experience on indoor and outdoor projects involving the same problems as cleaning an athletic stadium, but which were physical structures different in use classification from a stadium, an arena or a race track. (See Appendix "A", Part IV).

10. Building Maintenance Services Inc. (B.M.I.) is the only private maintenance company which has experience in any of the local stadia, arenas or race tracks, having gained its experience at a previous time at the "Spectrum" arena; none of the other stadia, arenas or race tracks in Philadelphia were maintained by private companies, or companies owned by other

---

[2] Due to the complex nature of the factual question involving Clarkie's actual competency, extensive testimony was presented relative to Clarkie's prior experience. Rather than to list such voluminous evidence in paragraph form, we shall instead summarize the relevant aspects of Clarkie's prior experience in Appendix "A" attached hereto.

than the Philadelphia "Phillies" baseball team or the Philadelphia "Eagles" football team prior to period I. (See Appendix A, Part III).

11. Only B.M.I. among Philadelphia firms could, therefore, meet the proof-of-competency specifications in the city's invitation to bid on the maintenance contract at the stadia, and no qualified out-of-city maintenance firms submitted bids in any of the years in question.

12. During the time between period I and period III, the president of B.M.I. resigned from the corporation in order to take employment with the owner of the Philadelphia "Eagles" football team, thus leaving a gap in experience, of the type required by the city in its proof-of-competency specifications above referred to, in the executive structure of B.M.I.

13. In period I, Clarkie's was the low bidder, but the city rejected all bids and called for the resubmission of the bids.

14. In the second set of bids in period I, Keystone Building Maintenance (Keystone) was the low bidder but the contract was awarded to B.M.I. when Keystone was disqualified due to its inability to meet the proof-of-competency specifications presently at issue.

15. In period II, Technical Building Maintenance (Technical) was the low bidder, but the contract was awarded to B.M.I. solely due to the inability of Technical to meet the proof-of-competency specifications here at issue.

16. In period III, the low bidder was Clarkie's but the contract was awarded to B.M.I. solely due to the inability of Clarkie's to meet the proof-of-competency specifications referred to previously.

17. The manual labor involved would primarily be supplied under exclusive first option by the local union as provided in the contract, so that the same labor pool

and the same manual laborers would be available and used regardless of whether B.M.I. or Clarkie's was awarded the contract.

## DISCUSSION

Prior to embarking upon a detailed discussion of the central legal inquiry involved herein, namely whether or not the city officials acted in an arbitrary or capricious fashion or abused their discretion and power in promulgating the proof-of-competency specifications at issue, we believe it proper to first consider the threshold argument advanced by the city, asserting that plaintiffs as disappointed bidders lack standing to pursue their action. This issue was recently resolved in a definitive manner by the Commonwealth Court in Altemose v. The Pennsylvania Higher Education Facilities Authority, 7 Comm. Ct. 596, 600 (1973), wherein the court concluded that "plaintiffs in their *taxpayer status* may seek to enjoin the awarding of the contract, in this case." (Emphasis the court's).

We believe, as the court did in the Altemose case, that plaintiffs commenced the instant action as taxpayers and not as disappointed bidders and, therefore, have standing for this suit.

Further, as stated by McQuillin, in his definitive treatise on municipal corporations: "It has . . . been observed that those who bid or, desiring to do so, are refused the opportunity, are not to be denied relief merely because it is private profit and not public benefit which actuates them, for it is in the public interest that bidding, as a practice, be fostered and maintained": 10 McQuillin, Municipal Corporations, §29.29 (3rd Ed., 1966).

Turning now to the merits of the controversy, we must preface our discussion with a review of the general principles involved in a challenge by a tax-

payer to an award by the city of a municipal contract. The awarding of the contract for maintenance and janitorial services at the stadia, at issue in the instant case, is governed by section 8.8-200(1) of the Philadelphia Home Rule Charter which provides that:

"Except in the purchase of unique articles or articles which for any other reason cannot be obtained in the open market, *competitive bids shall be secured* before any purchase, by contract or otherwise is made or before any contract is awarded for construction, alterations, repairs or *maintenance* or for rendering any services to the City other than professional services and the purchase shall be made from or the contract shall be awarded to the *lowest responsible bidder.*" (Emphasis supplied).

Competitive bidding requirements are for the purpose of inviting competition, guarding against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts and to secure the best work or supplies at the lowest price practicable, and are enacted for the benefit of property holders and taxpayers, and not for the benefit of enrichment of bidders and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest: Yohe v. Lower Burrell, 418 Pa. 23, 28, 208 A. 2d 847 (1965).

The awarding of a municipal contract is within the discretion of the city officials, and courts will not sit in review of such municipal actions in the absence of proof of arbitrary action equating an abuse of discretion: Weber v. Philadelphia, 437 Pa. 179, 262 A. 2d 297, 299 (1970). Further, absent a finding by the court such abuse of discretion, courts do not inquire into the *wisdom* of municipal actions and judicial discretion

should not be substituted for administrative discretion: Id. at 299.

It is also to be noted, however, that laws requiring a contract to be let to the lowest bidder are based on public economy and are of great importance to the taxpayers; they are of a highly remedial character and have been held to require a construction which will fully effectuate and advance their true intent and purposes and which will avoid the likelihood of such policy being circumvented, avoided or defeated: City of Miami Beach v. Klinger (Fla.), 179 So. 2d 864, 866 (1965).[3] Where competitive bidding is required, any ordinance which unduly limits the number of bidders, thus tending to increase the cost of the work, is void: City of Opa-Loca v. Trustees of the Plumbing Industry Promotion Fund (Fla.), 193 So. 2d 29, 32 (1966).

McQuillin summarizes these principles in the following manner:

"Section 29.44 . . . the request for bids must not unduly restrict competition. The dictates of public policy require that all responsible bidders shall have the opportunity to compete, and accordingly devices or unreasonable actions by authorities which are designed or tend to limit the list of qualified bidders are presumed to be injurious to the taxpayer and are illegal. *All parties having the ability to perform the advertised contract should be allowed to compete freely without any unreasonable restrictions. . .*"

"Section 29.72 . . . [T]he discretion in awarding

---

[3] Due to the importance and also the complex nature of the issue here involved, namely the entire question of municipal discretion in awarding a contract to the "lowest responsible bidder," we have found it helpful and, indeed, necessary to examine a wide selection of judicial decisions, including those of other states.

the contract must be exercised fairly and reasonably within the spirit of the law. . . These provisions should not be so strictly construed as to reduce the authorities to mere ministerial agents, since this would often defeat the purpose for which they are designed, by allowing unscrupulous contractors to defraud the city. On the other hand, if the authorities are vested with too broad discretionary powers, the way for fraudulent practices is again left open. *Therefore, such provisions are made to be applied according to their spirit in a manner best adapted to conserve the public interests.*" 10 McQuillin, Municipal Corporations (3rd Ed. 1966), pages 355-356, 415-418. (Emphasis supplied; footnotes omitted).

Moreover, with respect to the underlying principles involved in judicial review of decisions of municipal officials to award city contracts, the courts apparently give special consideration or closer scrutiny to such actions in cases such as the cause at bar, where plaintiff's bid was lower than that of the party to whom the contract was awarded.

This method of inquiry was announced by our Pennsylvania Supreme Court in Kratz v. Allentown, 304 Pa. 51, 54, 155 Atl. 116 (1931):

"[T]o award the contract to a higher bidder capriciously without a full and careful investigation is an abuse of discretion which equity will restrain. (Citations omitted). Where a full investigation discloses a substantial reason which appeals to the sound discretion of the municipal authorities, they may award a contract to one not in dollars the lower bidder. The sound discretion, which is upheld, must be based upon a knowledge of the real situation gained by a careful investigation." (Parenthetical insertion supplied).

This very policy has also been enunciated by the courts of New Jersey. Speaking for the court in Sel-

litto v. Cedar Grove Tp., 133 N. J. L. 41, 42 A. 2d 383 (1945), Judge Perskie said,

"The law is clear. Prosecutor's status, as the lowest bidder, is not one of grace; it is one of right. Such a status may not lightly be disturbed. For it is based upon competition, a state policy."

Furthermore, the court in M. A. Stephen Const. Co. v. Borough of Rumson, 118 N. J. Super. 523, 525, 288 A. 2d 873, 874 (1972), stated that:

"The public interest is served by permitting suits to enforce the policy of competitive bidding. A low bidder is entitled to be heard by the public authority before his bid is rejected; and if his bid is rejected, to sue. [Citations omitted]. A rejected low bidder has 'an interest of some character which will support a claim to be heard.' [Citations omitted]. The interest is conferred on him to the end that the public will obtain all that is due it in the process of procuring public contracts rather than for the bidder's individual aggrandizement [Citations omitted]."

Turning now to considering the factual circumstances in the instant case, we find that the cases, in their effectuation of the foregoing general principles, impel us to conclude that the proof-of-competency specification in the city's invitation to bid on the maintenance and janitorial contract for the stadia here at issue was an undue restriction on competitive bidding and was an abuse of discretion by the city officials, and we must, therefore, restrain the continuation of such a specification.

In Kratz, supra, at 54-55, the city had awarded the contract for crushed stone to Y, a higher bidder than plaintiff. The city asserted, as its reason for choosing Y, that it preferred stone from the quarry that Y planned to utilize, over the quarry to be employed

by plaintiff.[4] Conducting the closer scrutiny of the award, alluded to previously, which is undertaken by courts in cases such as the present cause, where plaintiff is a disappointed low bidder, the court in Kratz called for an examination of the *actual* qualifications of such a low bidder before rejecting his bid, saying:

"The city had the right to call for stone of a particular quality and fitness, but not from a particular quarry. To do the latter, might create a monopoly and prevent competitive bidding. (In Kratz the city's reason for preferring stone from Y's quarry was a fear, unsubstantiated by any sufficient investigation, that plaintiff's quarry could not supply enough material for the project.) *The rejection of that quarry with at most a perfunctory investigation was an abuse of discretion*: Id. at 54-55. (Parenthetical insertions and emphasis supplied).

Thus the Kratz Court would allow the city to issue specifications which were *relevant* to the tasks inherent in the contract, but would *not* sanction a specification which arbitrarily singled out one group or contractor, unless the city showed that group or contractor to be *uniquely* or *solely* qualified to be able to perform the contract.

In the case at bar, as has been noted heretofore, Clarkie's in period III *was* the lowest bidder, and we

---

[4] Due to the nature of the question before us, involving scrutiny of a unique municipal contract, our analysis of the relevant precedents must necessarily proceed on a case-by-case basis, for the ultimate decision turns upon whether the *precise* specification at issue, in the exact circumstances surrounding the present contract, amounted to an abuse of power or discretion by the city. Thus by definition it is practically impossible to find a case precedent which is totally square with the facts herein. We shall, as previously mentioned, therefore, be bound to enter into a more thorough and more wide-ranging discussion of prior decisions than is normally our practice.

must, therefore, use special scrutiny in analyzing the city's reasons for rejecting Clarkie's bid in period III.[5] Further, since the contract with the city contemplated the use of union employes, where the union would have first option in deciding who would be employed to do the manual labor involved, the actual work would be performed by the same experienced laborers, regardless of whether B.M.I. or Clarkie's was eventually awarded the contract.

Thus, as in Kratz, where the two competing bidders outwardly possessed relative similarity in their ability to perform the manual, or simple mechanical project upon which they had bid, the city was bound by law to have made a thorough investigation into the prior experience of Clarkie's in such work before rejecting the lower bid of Clarkie's. This investigation was not undertaken by the city, but instead Clarkie's was immediately rejected as a potential contractor because, *regardless* of prior experience in comparable or even more complex projects, Clarkie's had not happened to have concentrated on obtaining maintenance contracts in *athletic* facilities.

Furthermore, as discussed previously, prior to period III, the president of B.M.I. resigned from the corporation. Since the crucial facets which would de-

---

[5] Plaintiff was also the low bidder on the first bid in period I, but the city rejected all bids and called for the resubmission of bids. We do not find any impropriety in such action by the city in period I for, as provided in the Philadelphia Code, section 8.8-200(2)(b), the city may reject all competitive bids if it shall be deemed in the interest of the city to do so; and the city rather than the courts must initially decide if rejection is in the interest of the city. Weber, supra, at 300. At trial in the instant case, the city offered its explanation for the rejection of all original bids in period I; we have reviewed the record and find that such reasons were sufficient to support the rejection by the city of the first set of bids in period I.

termine several bidders' qualifications to perform the stadia maintenance contract would be the prior experience of the bidder's *executives* in directing maintenance and janitorial operations on an athletic facility seating more than 20,000 (the manual laborers being practically identical regardless of whether B.M.I. or Clarkie's performed the contract) this gap in such experience at the executive level of B.M.I. created by the resignation of its president could also, *under the city's own proof-of-competency specifications,* have disqualified *B.M.I.* from being awarded of the contract.

In Kibler v. Girard Boro, 18 Erie 129 (1936), the borough undertook to generate its own electricity supply. To this end, it advertised for bids for production of two Diesel engines and necessary auxiliary equipment, as specified. The bid of defendant Y was accepted, and plaintiff sued to enjoin the award of the contract. The court found that the borough's specifications contained such restrictions as to the style, character and arrangement of the equipment, so as to exclude competent and reputable manufacturers other than defendant Y from bidding in accordance with the specifications. Despite the presumption of regularity in the preparation of specifications by a municipality, the court in Kibler (Hirt, P.J.) granted plaintiff's prayer for injunctive relief.

The Kibler court further explained in language significant for the instant case, that:

"Bidders were limited in other respects. The provision, 'each proposal to be accompanied by a list of five plants in operation for five years serving the municipalities of approximately the same population as Girard,' favors [defendant Y]. They have concentrated on municipal contracts and have furnished many engines for municipal lighting plants. But no

peculiar service is required of a Diesel engine in a municipal plant as distinguished from one operated by a public utility or an industry, if the character of the service demanded is *comparable.*

"...

"Borough specifications such as these must be so drawn as to invite reasonably free and open competition. And a specification which has the effect of putting unnecessary obstacles in the way of those who may want to bid, is faulty and illegal: American LaFrance and F. Corp. v. City of New York, 281 N. Y. Supp. 519; Kratz et al. v. Allentown et al., 304 Pa. 51; Brener v. Philadelphia, 305 Pa. 182 [157 A. 466 (1931)]; Pearlman v. Pittsburgh, 304 Pa. 24 [155 A. 118 (1931)]": Kibler at 142-143. (Emphasis supplied).

Examining the instant case within the framework of the reasoning in Kibler, it is apparent to us that the Kibler rationale would hold that the city's proof-of-competency specification incident to the contract for maintenance and janitorial services at the stadia was arbitrary and should not have been applied so as to disqualify Clarkie's from bidding on the contract. The precise project involved, that of cleaning an athletic stadium composed of approximately 97 percent concrete and three percent wood and other elements is, we find, indistinguishable in its cleaning requirements from any large building which is partially indoors and partially outdoors.

There is nothing extraordinary in the composition of the stadia's concrete or of its wooden seats which makes the cleaning thereof any more difficult than the cleaning of the Frankford Arsenal, or of the Gateway Insurance Building, or certainly of Temple University, which massive projects Clarkie's had previously successfully completed. (See Appendix "A")

Thus, the only reason for the award of such contract to B.M.I. instead of accepting the lower bid of Clarkie's was the fortuitous circumstance that B.M.I. had happened once to concentrate on the maintenance contract for an indoor arena (the Spectrum) rather than to have devoted its efforts to obtaining maintenance contracts of the type performed by Clarkie's. Since no particular service is required in cleaning the stadia as distinguished from cleaning buildings of the type maintained previously by Clarkie's, the proof-of-competency specifications issued by the city in its invitations to bid constituted an abuse of discretion and power by the municipal authorities which acted to unduly restrict competitive bidding in the award of this city contract. Similarly, in Pearlman, supra, the court held that the city could not limit its purchase of parking meters to one particular brand, where any of three different brands would actually have been satisfactory, for to do so would stifle competition.

The city cited Weber v. Philadelphia, supra, as precedent for its position, and our own research has led us to Corcoran v. Philadelphia, 363 Pa. 606, 70 A. 2d 621 (1950), which also arguably supports the city's specification presently at issue. As discussed earlier, however, our analysis of the letting of contracts by a municipality must proceed on a case-by-case basis. We have thus examined and compared Corcoran and Weber against the factual background of the instant case, and find those decisions to be factually inapposite.

In Corcoran, the disputed contract was for the purchase of extremely complicated machinery, and the city, therefore, properly issued quite detailed specifications for the type of equipment it desired. The result in Corcoran of limiting the qualified bidders

to a select few was a necessary and natural concomitant of the complex services for which the city contracted.

Here, the contracted-for services are far from complex or sophisticated; they consist of the delivery of maintenance and janitorial labor in basically cement and wood athletic stadia. There is nothing so specialized about this work in the stadia, in our opinion, as to justify the city's position that none other than a company experienced in maintaining an athletic facility could clean the stadia rather than a company such as Clarkie's, experienced in cleaning structures composed of the same materials and requiring identical services and equipment as the stadia, but which are utilized for a purpose other than sports.[6] It is, therefore, plain to us, as noted earlier, that Corcoran is without application to the cause at bar.[7]

Nor do we find Weber to have controlling weight when applied to the present facts. There, the contract in question was for concession services at Veterans' Stadium. The city rejected all original bids and its stadium committee issued a report calling for added specifications. These added requirements included, inter alia, (2) the joinder of operation of the sumptuous "stadium club" restaurant with the basic responsibilities of a concessionaire, and (b) a requirement of prior stadium experience. Plaintiffs brought an action to enjoin addition of these requirements to the invitation to bid.

---

[6] This is particularly true in light of the fact that the manual labor would be almost totally performed by the same persons, regardless of whether B.M.I. or Clarkie's were awarded the contract.

[7] Moreover, in Corcoran, as opposed to the instant case, *both* bidders could meet the specifications and the contract *did* go to the low bidder.

The gravamen of the complaint in Weber concerned the joinder issue, which the court found to be within the proper discretion of the city officials under those factual circumstances. The court then stated, without further explanation, that the prior experience specification did not "appear" unreasonable: Id. at 301. We believe that the court's holding, although correct under the facts of Weber, cannot be extended to apply to the present dispute over the stadia maintenance and janitorial contract.

In Weber, as contrasted with the case at bar, the disputed contract involved providing healthy and sufficient food to as many as 50,000 persons. It further involved operation of a sophisticated restaurant, supplying and preparing the meals for same. These operations are far more complex than the basically menial tasks involved in a maintenance contract such as that herein, and involve a much greater panoply of administrative decisions than the basic two-pronged problem of simply assuring sufficient men and machinery in a maintenance and janitorial operation.

Thus, it would be expected that the necessity of having *precisely* similar prior experience would be relevant in awarding the *concessions and restaurant* contract at Veterans' Stadium, whereas prior experience in servicing comparably-sized structures under occasional short deadlines; subject to the test of the elements and to fluctuating attendance would totally fulfill the needed qualifications for the stadia's *maintenance and janitorial* contractor.[8]

---

[8] In elaborating on the city's alleged reasons for requiring prior experience in a staium, arena, or race track as proof of competency to maintain the stadia, Vye identified the problems involved in such services as coping with (1) the size of the stadium, (2) cleaning under the elements, (3) occasional short deadlines

Furthermore, the court's statement in Weber that the city could properly require prior stadium experience in awarding the concessions and stadium restaurant contract was made without additional explanation; there was no showing in Weber, as in the instant case, that the prior experience requirement would serve to create a near or actual monopoly for one bidder, or that the requirements would exclude a sizeable class of potential bidders, who had experience performing the tasks involved in the same magnitude as would be required in servicing the stadium. These factual considerations, present in the case at bar, when viewed against the previously noted policy directive to our courts to protect the taxpayers in municipal contract cases by assuring full competition among the complete spectrum of capable and responsible bidders, and particularly when viewed in light of the simple, menial nature of the maintenance and janitorial services here involved, constrain us to conclude that the Weber holding, though of some persuasiveness, should not be followed in the present case.

---

for performance, and (4) the variance in manpower needs according to the rises and falls in the stadia attendance. Since the manpower pool would be essentially the same regardless of whether B.M.I. or Clarkie's performed the contract, the only material variable noted by Vye as precipitating the city's stringent requirement of prior experience cleaning a stadium, arena or race track was the occasional need to meet short deadlines and to recruit additional laborers. This experience can clearly be gained on jobs other than stadium maintenance, as is borne out by Clarke's *own* experience. (See Appendix "A"). It is obvious to us that, albeit justified in the face of the multiple variables and the health problems inherent in providing food and restaurant services in Weber, the city's severely limiting proof-of-competency specification, applied to bids for a simple *maintenance and janitorial* contract on uncomplicated buildings such as the stadia, amounts to a case wherein the city has overreacted to the problems cited by Vye and discussed above.

Finally, it is important to note that Weber was a case wherein *all* bids had been *rejected*, in contradistinction to the matter before us, wherein plaintiffs are *low bidders* who were passed over by the city in favor of a higher bidder. The close scrutiny to be applied to the specifications in this latter instance, discussed heretofore, was not called for in the posture of the Weber case.

Our adherence to the principles of the Kratz-Kibler-Pearlman line of cases, as outlined earlier, is consistent with the treatment by the New York and New Jersey courts of cases analoguous to the present controversy. In Resco Equipment & Supply Corp. v. City of Watertown, 313 N. Y. Supp. 2d 74 (1970), the city invited bids on a contract for the sale of a truck to the city. The court held that a factual issue existed as to whether the specifications limited the award to the producers of a truck sold exclusively by one certain bidder, stating that competitive bidding requirements are violated when the specifications are so manipulated as to preclude true and fair competitive bidding: Id. at 75.

In Sellitto, supra, plaintiff was, as mentioned previously, a disappointed low bidder. In examining the reasons for the city's actions with the special scrutiny due a rejected low bidder, the court refused to sanction such rejection when made, as here, without thorough investigation as to plaintiff's *actual* qualifications to satisfactorily perform the contract. The court, in very clear language, delineated the test for scrutinizing a rejection by the city officials of the lowest bidder:

"Since prosecutor was, without question, the lowest bidder, the only question was and is whether he was a responsible bidder. That is a question of fact. . . A finding that one is not a responsible bidder must

be based upon a finding by the majority of the members of the governing body that the bidder 'was so lacking in experience, financial ability, machinery and facilities necessary to perform the contract as to justify a belief upon the part of fair-minded and reasonable men that [he] would not be able to perform [his] contract.' And 'To reject the bid of the lowest bidder there must be such evidence of the irresponsibility of the bidder as would cause fair-minded and reasonable men to believe that it was not for the best interest of the municipality to award the contract to the lowest bidder.' [Citations omitted]": Id. at 133 N. J. L. 43, 42 A. 2d 385.

Although, of course, we realize that precedents of other States have no binding authority on our Pennsylvania courts, we, nevertheless, find the guidelines set forth in Sellitto to constitute a praiseworthy balancing of the discretion vested in municipal authorities in awarding city contracts and the interest of the public in eliminating waste resulting from favoritism or unfair restriction of competition in this field. The limiting specification at issue before us, which allowed the city to reject in a perfunctory fashion a low bidder (Clarkie's) who was, we believe, otherwise qualified to perform the work involved in the contract, is the very type of situation to which the Sellitto court was speaking.

Our research also enabled us to come upon a strikingly similar situation in New Jersey as that which has confronted us here. In Rankin v. Board of Education of Egg Harbor Tp., 135 N. J. L. 299, 51 A. 2d 194 (E. & A. 1947), plaintiff underbid defendant three consecutive times in a contract to provide the city with school bus service but was rejected because (a) the city enlarged the specifications for the bus and plaintiff could not change its operation to meet the

enlarged requirements, whereas defendant was immediately so equipped, and (b) the city specified that the contractor *must have had at least one year's experience driving a school bus* and plaintiff, despite having extensive *comparable* prior experience, lacked experience within the *precise* limits of this latter specification.

The Rankin court set aside the contract as illegal, and, with respect to the prior-experience specification, particularly noted plaintiff's 20 years prior *comparable* experience driving pleasure cars and trucks, and found the proof-of-competency specification in Rankin to unreasonably limit competitive bidding, Id. at 196.

Rankin is, in our opinion, singularly applicable to the facts in the instant case. Here, as detailed in our Appendix, Clarkie's extensive prior comparable experience, but its low bid was rejected out of hand by the city because Clarkie's did not happen to have performed maintenance services at a *stadium, arena or race track.* Clarkie's has, as heretofore illustrated, satisfactorily completed contracts at large structures, working under the elements, meeting short deadlines, dealing with fluctuating amounts of persons using the facilities and rapidly recruiting extra laborers; it has, therefore, as plaintiff in Rankin, had more than sufficient experience in treating the very *problems* cited by the city as having prompted the city's limiting proof-of-competency specification.

It is also pertinent to remark that a contractor might have fortuitously worked on a stadium, arena or race track in the past, and, therefore, have met the requirements of the city's proof-of-competency specification, yet in so doing the contractor may *not* have faced the *problems* which motivated the city to delimit

competency in the manner chosen. For example, a company could foreseeably have performed a year's maintenance and janitorial contract for a college stadium, involving five football games, spaced at two-week intervals due to the team schedule calling for only five home games. Thus, such a contractor which, unlike Clarkie's would *not* have had experience with meeting short deadlines or rapidly recruiting additional laborers, because of the two-week period between games, would nonetheless be considered by the city to be more "competent" than Clarkie's to clean the stadia.

Moreover, it is to be noted that *B.M.I.* whose higher bid was accepted over that of Clarkie's solely because B.M.I. had cleaned the "Spectrum" arena did not, on that contract, have to face the difficulties of outdoor cleaning, and was, therefore, found "qualified" to bid by the city, without having to show past experience cleaning under the elements.

Finally, it is apparent that a bidder which had previously cleaned a "tent" seating 10,000, after events such as a circus, where the refuse was predominately sticky children's candy and thus more difficult to remove, would *not* be competent under the city's specification, whereas if the tent were a concrete structure such as the "Spectrum", with the same circus and the same audience inside and the same cleaning challenges, the bidder *would* have been competent under the specification because the "Spectrum" is an "*arena.*"

For the reasons discussed and illustrated above, we are constrained to conclude that the city's proof-of-competency specification here at issue, although not the product of a corruptive motive by the city officials, was an abuse of discretion and power in that

it unreasonably restricted competition among qualified bidders and was thus not in the best interests of the public. We shall accordingly enjoin continued use of such specification in the invitations to bid for the maintenance and janitorial contract or contracts for the stadia.

Plaintiffs have also requested that we go beyond simple injunctive relief in this case, and that *we* issue a specification which will serve as the proof-of-competency requirement in future city invitations to bid on the stadia maintenance and janitorial contract. To this end, plaintiffs have submitted constructive suggestions for a new specification.

We do not, however, believe that such additional relief is properly within our equity powers herein, for it would result in the substitution by this court of its own view of what is wise, for that of the city. We, therefore, limit ourselves to stating that the *present* specification is arbitrary and capricious, in that it does not reasonably seek to insure that the contractor will have met the key problems relevant to cleaning an athletic stadium, and because the specification arbitrarily excludes qualified contractors from competitive bidding.

Nor do we find it proper to grant monetary damages to plaintiffs. As stated in McQuillin, §29.86.

"Since the power of letting public contracts must be exercised for the benefit of the public and not of the bidder, it is generally held that an award of a contract to one other than the lowest bidder does not entitle the lowest bidder to a recovery of damages from the municipality, nor to an action to recover profits which he might have made had his bid been accepted. And an unsuccessful bidder has no right of action for damages against the officer personally who refuses to award him the contract, even though

such refusal is made in bad faith and maliciously."
(Footnotes omitted).

Accordingly, in light of the foregoing discussion,
we reach the following:

## CONCLUSION OF LAW

The specification of defendant City of Philadelphia,
requiring one year of prior maintenance and janitorial
experience in a stadium, arena or race track seating
more than [10,000 in periods I and II, (April 1, 1971
through March 31, 1972 and April 1, 1972 through
March 31, 1973), and 20,000 in period III (April 1,
1973 through March 31, 1974)] is arbitrary and capricious and amounts to an abuse of discretion by the
city in that it unreasonably restricts competitive bidding on a city contract, in violation of section 8.8-200
(1) of the Philadelphia Home Rule Charter.

## DECREE NISI

1. Defendant, City of Philadelphia, is enjoined
from continuing to include a requirement of prior experience in a stadium, arena or race track as a limitation on the class of qualified contractors in its invitations to bid for the maintenance and janitorial
contract at Veterans' Stadium and John F. Kennedy
Stadium, costs to be paid by defendant City of Philadelphia.

2. The prothonotary is directed to notify all
parties of the filing of this decree nisi and if no exceptions are filed pursuant to Pennsylvania Rule of
Civil Procedure 1518, this decree nisi shall be entered
by the prothonotary as the final decree, in accordance
with Pennsylvania Rule of Civil Procedure 1519.

## APPENDIX "A"

### Part I

I. Clarkie's pertinent prior maintenance and janitorial experience on jobs comparable to either stadium in area and work force requirements may be summarized as follows:

| | Job | Approximate Area Involved | Work Force |
|---|---|---|---|
| (a) | Western Electric | 500,000 sq. ft. | 18 daily |
| (b) | W.P.V.I. | 100,000 sq. ft. | 10 daily |
| (c) | Philadelphia Navy Yard, buildings and grounds | area involved too large to approximate but certainly larger than the area to be cleaned in Veterans' Stadium | not given |
| (d) | Gateway Insurance Company Building | 300,000 sq. ft. | 40 daily |
| (e) | Philadelphia National Bank Building | no approximation given as to area involved | not given |
| (f) | Philadelphia Savings Fund Society Building | no approximation given as to area involved | not given |
| (g) | Girard Bank Building | no approximation given as to area involved | not given |
| (h) | Fidelity Building | no approximation given as to area involved | not given |
| (i) | Temple University, buildings and grounds | 1,500,000 sq. ft. | 45 daily, plus 10-15 men twice per month on special jobs |
| (j) | Signal Corps Building | 400,000 sq. ft. | 30 daily |
| (k) | Community College | 200,000 sq. ft. | not given |
| (l) | Frankford Arsenal | 400,000 sq. ft. | 25 daily, 24 hrs. per day |

It is to be noted that both the Navy Yard job and the Temple University job (both of which contracts involved a larger area than Veterans' Stadium) and on the Western Electric job, the contract provided for union labor to be supplied through Local 69, the same union which would service the stadia contract.

### Part II

II. Clarkie's prior experience, relative to the *job elements* cited by the City as inherent in providing maintenance and janitorial service for the stadia, is outlined below:

| *Job Element* | *Experience* |
| --- | --- |
| (1) Sweep all seating areas, ramps, moving stairways, and other landings on higher tiers. | (1) Cleaned large classrooms at Temple U., including blood-stained anatomy laboratories. |
| (2) Remove all trash from Stadium. | (2) Has this task on all of the jobs listed in Part I of this Appendix, many of which jobs involve an area larger than Veterans' Stadium. |
| (3) Autoscrub corridors, ramps and concourses | (3) At Western Electric, plaintiffs autoscrub the warehouse (approximate area 250,000 sq. ft.) weekly. Plaintiffs also powerscrubbed the lavatories daily at Temple U. and performed a powerblast cleaning, with acid, on the WPVI Building. |
| (4) Clean and sterilize rest rooms | (4) As indicated, plaintiffs perform this task at almost every job. |
| (5) Vacuum carpet areas of first and third base deluxe boxes | (5) At the Gateway Insurance Bldg., plaintiffs vacuum daily a larger carpet area than that entailed at Veterans' Stadium. |
| (6) Hydroblast lavatory walls and fixtures | (6) At the Gateway Insurance Co., plaintiffs performed this operation on the entire building immediately following construction; the task at Gateway was actually more difficult than that involved at Veterans' Stadium because at Gateway plaintiffs had to clean excess concrete from the walls. |

(7) Clean and scrape excess gum off walkways and corridors

(7) Plaintiffs performed this task at Western Electric, Temple U., and Community College.

(8) Clean locker rooms.

(8) Plaintiffs clean twelve locker rooms and shower rooms daily at Western Electric; the area cleaned surpasses that of the locker room area at Veterans' Stadium.

## Part III

III. The following is a list of the other stadia, arenas or race tracks in the Philadelphia area which seat more than 10,000, together with the names of the maintenance or janitorial companies servicing these facilities:

| Facility | Janitorial or Maintenance Contractor |
|---|---|
| (a) Franklin Field | (a) University of Pennsylvania |
| (b) John F. Kennedy Stadium | (b) Formerly serviced by the City; presently at issue herein. |
| (c) Veterans' Stadium | (c) Building Maintenance, Inc., presently at issue herein. |
| (d) Temple University Stadium | (d) Temple University |
| (e) Civic Center | (e) City of Philadelphia |
| (f) The Spectrum | (f) Presently serviced by the City; serviced at one time by Building Maintenance, Inc. |
| (g) Villanova Stadium | (g) Villanova University |

It is relevant to note that, with regard to Franklin Field, Vye testified that Berlo Vending Co., the vending contractor, does some cleanup work incident to its primary vending duties. The exact nature and extent of this work was not further established, however, and it is clear to us that Berlo did not participate in the type of total operation that would qualify it as having met the boundaries of the City's proof-of-competency specification in the invitation to bid for the janitorial and maintenance services contract at Veterans' Stadium and John F. Kennedy Stadium, at issue in the instant cause.

## Part IV

IV. Clarkie's prior experience with respect to the problems noted by the City as alleged justification for the City's proof-of-competency specification, is detailed below:

| Problem Alleged by City as Unique to Stadium Cleaning | *Prior Experience of Clarkie's in Meeting Such Problem on Structures Comparable to, but Different in use from an Athletic Stadium.* |
|---|---|
| (1) Working outside, exposed to the elements. | (1) At Frankford Arsenal, Temple University, and Community College, Clarkie's was responsible for cleaning a larger outdoor area than that of either stadium. |
| (2) Occasional short deadlines for performance of maintenance and janitorial work. | (2) On the Frankford Arsenal contract, Clarkie's had to perform a cleaning far more sophisticated than the type of cleaning of Veterans' Stadium, despite having only a 24-hour deadline. |
| (3) Occasional need of rapidly recruiting additional laborers. | (3) Both at Temple University and at Frankford Arsenal, Clarkie's had to recruit extra laborers on short notice to perform its work. * |
| (4) Fluctuation of attendance at the Stadium causing variations in the amount of work necessary. | (4) At every large facility serviced by Clarkie's, especially Temple University, Community College and such as WPVI Studios, the attendance at the facility is subject to extreme daily fluctuation. |

*It is again to be emphasized in this respect that due to the nature of the maintenance contract of the stadia, which gave the local union first exclusive option to produce the laborers for the contract, Clarkie's will always have a ready supply of laborers for performance of the contract. Further, when BMI has been unable to meet its necessary supply from the union labor pool it has simply gone into the surrounding neighborhood and recruited neighbors for the tasks involved. There is no great difficulty or talent inherent in such recruitment activities such that Clarkie's would not easily be able to undertake the same type of recruitment.