2001-NMCA-066

31 P.3d 381

**RENAISSANCE OFFICE, LLC and Michael Branch, Petitioners–Appellees,**

v.

**STATE of New Mexico, GENERAL SERVICES DEPARTMENT, PROPERTY CONTROL DIVISION, Respondent–Appellant.**

No. 21,570.

Court of Appeals of New Mexico.

July 18, 2001.

Certiorari Denied, No. 27,075,
Aug. 23, 2001.

Ronald J. VanAmberg, Roth, VanAmberg, Rogers, Ortiz, Fairbanks & Yepa, LLP, Santa Fe, NM, for Appellees.

Walter G. Lombardi, Risk Management Division Legal Bureau, Santa Fe, NM, for Appellant.

## OPINION

SUTIN, Judge.

{1} The State of New Mexico General Services Department (GSD) asks this Court to reverse the district court's appellate determination favoring a protest of GSD's cancellation of a request for proposals for leased office space under the Procurement Code. GSD seeks review in this Court of whether Section 13–1–182 permits an award of contract damages in the absence of a finding of a valid, written contract, inasmuch as Section 37–1–23(A) grants immunity to State agencies such as GSD from actions based on contract except when based upon a valid, written contract. We decline GSD's request and affirm.

### BACKGROUND

{2} The State of New Mexico Department of Health (DOH), in conjunction with GSD's Property Control Division (PCD), issued a Request for Proposals for Leased Office Space (RFP). In November 1997 Petitioner Renaissance Office, LLC, whose partners include Allen Branch and Petitioner Michael Branch, submitted a build-to-suit, twenty-year lease proposal that gave the State the option to purchase the property for one dollar at the end of the lease. On December 19, 1997, DOH notified Gerald Chavez, Chief of PCD's Leasing & Property Management Bureau, of DOH's selection of the Renaissance proposal "as the top ranked proposal" and requested PCD's approval to proceed with the Renaissance project. In that notification, DOH also asked PCD to reissue the RFP if the project in question was not acceptable. In addition, DOH asked PCD for "a sample letter to be issued to the top offer."

{3} On January 13, 1998, PCD's Chavez authorized DOH to "proceed with notification to ... Renaissance ... that they are the 'Top–Ranked Offeror' and may proceed with Lease Record Drawings." PCD stated: "We look forward to receiving copies of your notification letters and receiving the Lease Record Drawings and the Lease Agreement." On the same day, DOH selected the Renaissance Office Park site and instructed Renaissance to prepare lease record drawings and submit them to PCD for review. DOH informed PCD of this.

{4} In a conversation with PCD's Chavez on February 18, 1998, Allen Branch learned of a PCD concern about the legality of the purchase option in the Renaissance proposal. Branch corresponded with Chavez on February 19, 1998, about the legal aspects of the issue and suggested PCD consider alternatives, including a sole source procurement based on the fact that the Branches were the only source offering lease-purchases.

{5} The record in this case does not reflect any correspondence or telephone communication between Renaissance and PCD from February 19 until May 12, 1998. At some point, presumably after the January 13 selection notification, Renaissance proceeded to prepare lease record drawings, which PCD received on April 8. On April 23, DOH sent the lease record drawings to PCD's Chavez, stating that DOH "reviewed them and finds them to be acceptable to our needs as requested through the request for proposal."

{6} Meanwhile, Renaissance prepared and submitted a twenty-year lease on the required GSD form, showing Renaissance as lessor and DOH as lessee, signed by Michael Branch on April 22, 1998. Under "Other Provisions," Renaissance inserted: "State of New Mexico has the option to purchase the office building at the end of the lease term for $1.00 (one dollar) plus all closing costs associated with the transferring of ownership." An attachment to the lease detailed the purchase-option concept, explaining why the build-to-suit, lease-to-own offer was a "win-win situation" for both parties. This

attachment was identical to that attached to the Renaissance proposal submitted to DOH in November 1997 and selected by DOH in January 1998.

{7} The lease was signed by a Special Assistant Attorney General on May 7, 1998, under the printed form statement "Additions to the standard Lease of Real Property have been reviewed and approved by:" and next to the handwritten statement "5/7/98 letter to David Vigil from Lester H. Swindle Director, Property Control Division." This May 7 letter from Swindle to Vigil, a DOH administrator, discussed whether leases could exceed ten years, and stated, among other things, that PCD had decided to waive the GSD Rule 92–501, section 12.2, maximum ten-year lease term limitation and to permit RFPs to "solicit a maximum lease term, not to exceed, twenty years." The lease was signed by DOH on May 12.

{8} Following a conversation Allen Branch had with the Office of the Secretary of GSD on or about May 12 regarding the purchase option, Renaissance sent a letter to GSD stating the Renaissance view that the purchase option was legal, in that neither DOH nor the State was obligated to purchase the building. Renaissance was nevertheless "willing to strike the purchase-option clause if the attorney general" did not agree. On May 14, PCD (Swindle) wrote to DOH (Vigil) that the RFP process had not been followed, in that neither "Signed (Lessor/Lessee) Lease Record Drawings" nor a lease "without the lease-purchase option pursuant to section 12.3 of GSD Rule 92–501" had been submitted to PCD. Noting that "this violates the terms of the RFP," PCD allowed five days to remedy "this situation." PCD attached Section 12.3 "*Options to Purchase: Any proposal which includes an option to purchase shall be deemed nonresponsive and shall be rejected.*" PCD stated that "[u]pon receipt of the aforementioned documents,

PCD will proceed to review their acceptability, and continue the lease process." PCD stated, too, that it would not consider approval or disapproval of the lease until all RFP requirements were followed, and that PCD's final determination would be made in the best interest of the DOH and the State.

{9} On May 28, 1998, Renaissance wrote to DOH, expressing concern that "Property Control is considering not signing our lease that we have been working on since last October." Branch noted that neither DOH nor PCD had objected to or revised the lease record drawings and that Renaissance proceeded to lease preparation according to the "agreed upon terms as per the RFP and agency negotiations." The letter also pointed out Renaissance had concluded on a timely basis the development of a 20,000–square foot building, involving construction drawings, engineering studies, forward commitments, land deposits, soils tests, surveys, lot split applications, title work, at a total cost of $245,000, including appraisal and legal fees. In this letter, Renaissance requested reimbursement of costs plus a reasonable profit if PCD did not sign the lease under NMSA 1978, § 13–1–182 (1984) [1] (Ratification or termination after an award) of the Procurement Code, NMSA 1978, §§ 13–1–28 to –199 (1984, as amended through 1999).

{10} On June 2, after learning that DOH and GSD lawyers "suppose[d] that if you drop the lease-purchase option provision in the lease, that it would violate other bidders['] rights," Renaissance suggested to DOH that DOH and PCD had authority under the RFP to drop the purchase option and proceed with the project. Presumably referring to Section 13–1–182, Renaissance asserted that because DOH had actually signed the lease, PCD had only three options under State law: "ratify the lease, amend the lease to comply with the law, or terminate the

1. Section 13–1–182 reads:
   If, after an award, the state purchasing agent or a central purchasing office makes a determination that a solicitation or award of a contract is in violation of law and if the business awarded the contract has not acted fraudulently or in bad faith:
   A. the contract may be ratified, affirmed and revised to comply with law, provided that a determination is made that doing so is in the best interests of a state agency or a local public body; or
   B. the contract may be terminated and the business awarded the contract shall be compensated for the actual expenses reasonably incurred under the contract, plus a reasonable profit, prior to termination.

lease and reimburse expenses and reasonable profit."

{11} On June 25, PCD notified Renaissance that PCD officially cancelled the RFP effective June 3, "pursuant to GSD Rule 92–501, Section 12.3 Options to Purchase." In a July 1 letter to GSD, Renaissance responded that Swindle "knew about the purchase-option in January when we met with him to specifically discuss the issue," but "never deemed the proposal non-responsive while it still was in the Bidding Phase." Further, Renaissance stated that "Swindle is reviewing a lease that does not even have a purchase-option provision since it was removed."

{12} A June 29 letter from Renaissance to PCD pointed out DOH ultimately accepted the lease without the purchase-option provision and that DOH had written to GSD that it was in DOH's best interests that PCD ratify the lease as submitted without the purchase-option provision. Renaissance sent PCD an invoice dated June 30 for $245,000 in costs, plus a 15 percent profit of $36,750, plus gross receipts tax, seeking total compensation of $299,359.38.

{13} Then, in a July 6 letter referencing a May 28 email from Renaissance to DOH, GSD notified Renaissance that, pursuant to Rule 92–501, Section 12.3, PCD cancelled the RFP. GSD stated that the Renaissance proposal, "which was premised on legally disqualifying elements, should have been disqualified at the beginning of the process." As a result, the RFP had to be cancelled and the entire process redone. Further, GSD stated: "This action may be inconvenient for you and the other proposers; however, if the process is not redone, any problems caused by the earlier RFP will just be compounded."

{14} Renaissance responded to GSD in a July 7 letter reiterating that PCD knew about the purchase option far before Renaissance incurred its costs in preparation of the lease record drawings, and that currently the lease had no purchase option in it. Renaissance and Michael Branch (Petitioners) formally protested the PCD and GSD actions on July 9, 1998, requesting "the contract be reinstated and that any conflicting RFP be cancelled," but also seeking "alternate relief provided for in NMSA 1978, § 13–1–182." Petitioners primarily grounded their protest in the following:

On January 13, 1998, the award letter was issued without conditions and with the request that Renaissance begin the production of lease record drawings, including site plan, floor plans, elevations, and other drawings sufficient to describe the proposed lease space. These were submitted and approved in April of 1998.

On May 14, 1998, Mr. Swindle requested that the lease record drawings be submitted and that the proposed lease agreement delete any "lease/purchase option." The proposed lease was not a lease/purchase option, but simply contained an option to purchase for $1 which could either be exercised by the State of New Mexico or not. It had no bearing upon the lease price. In any event, this condition was removed as requested by the May 14, 1998 letter and as authorized by NMSA 1978, § 13–1–182.

PCD denied the protest based on the documentary record.

{15} Petitioners sought review of PCD's protest denial in district court pursuant to Section 13–1–183 seeking compensation under Section 13–1–182 for actual expenses reasonably incurred plus a reasonable profit. The district court concluded PCD acted arbitrarily, capriciously, or contrary to law, and Petitioners were entitled to Section 13–1–182 relief. These conclusions were based on findings that "an award of the ... lease project" was made at the time the "notice of the award was mailed to [Petitioners] and requests made for [Petitioners] to proceed," and that this "award was again confirmed by [PCD] through a request that a perceived deficiency or revision take place to comply with law." In apparent response to GSD's positions that no contract existed because the PCD Director did not sign the lease agreement and that the State was immune because no valid, binding contract existed, see NMSA 1978, § 37–1–23(A) (1976) [2], the district court

---

2. Section 37–1–23(A) reads:

A. Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract.

also concluded that it need not "reach the issue of whether a contract was formed." Finally, the court held that Petitioners' "rights provided herein are supported by the doctrines set forth in *[Planning &] Design Solutions v. City of Santa Fe,* 118 N.M. 707, 885 P.2d 628 (1994)."

{16} The primary question, whether there was an "award of a contract" under Section 13–1–182, requires us to analyze whether the only "contract" that can be "awarded" under Section 13–1–182 in the lease procurement process is a lease agreement signed by the PCD Director. If Renaissance must prove a lease agreement signed by the PCD Director, for relief under Section 13–1–182, Renaissance's protest must fail. The immunity statute, Section 37–1–23(A), comes into play only if Section 13–1–182 permits relief for an "award of a contract" short of a lease agreement signed by the PCD Director. If a PCD-signed lease agreement is not required for Section 13–1–182 relief, then a determination must be made whether the Section 13–1–182 remedy clashes with Section 37–1–23(A) immunity and, if so, which prevails.

## Statutory Construction and Standard of Review

{17} We apply the principle that competitive bidding requirements will be "strictly construed against the governmental authority proposing the bid." *Wisznia v. State Human Servs. Dep't,* 1998–NMSC–011, ¶ 14, 125 N.M. 140, 958 P.2d 98. Further, we construe the Procurement Code liberally and apply it to promote its purpose to treat all persons involved in public procurement fairly and equitably. *Id.;* § 13–1–29(A), (C). We review de novo whether the district court erred in its interpretation of a statute. *TPL, Inc. v. N.M. Taxation & Revenue Dep't,* 2000–NMCA–083, ¶ 7, 129 N.M. 539, 10 P.3d 863.

## DISCUSSION

{18} We think it helpful to first discuss the procurement process, after which we set out the parties' contentions and our decision.

### A. Rule 92–501 and the Procurement Code

{19} GSD instructs us that the Procurement Code does not "by its own terms" apply to the procurement of leases for office space. *See* § 13–1–30(A) ("Application of the code."). GSD Rule 92–501 governs the leasing of office space. Section 3.6 of GSD Rule 92–501 provides, however, that it adopts the Procurement Code, "except to the extent that [Rule 92–501] conflicts with the Procurement Code."

### B. The RFP Form and the RFP Process

{20} The RFP sets out the specific procedure by which DOH sought the procurement of leased office space. Once the RFP is issued, and after a pre-proposal meeting, potential "Offerors" such as Petitioners are to submit a proposal on a GSD lease proposal form with a bond. "The RFP establishes the requirements used to evaluate and select the best overall [lease] proposal." A committee of the State executive agency seeking leased space under the RFP, here DOH, reviews the lease proposals and develops "recommendations for *award of lease space.*" The committee selects a "Lessor–Elect," called the "Top–Ranked Offeror," here Renaissance, and notifies the Director of PCD of the "*Notice of Award*" and "Notice to Prepare Lease Record Drawings."

{21} Lease record drawings are prepared by the Top Ranked Offeror and "typically are Schematic Design/Design Development level drawings which provide a general description of all major building systems and specifically [show] a positive response to [the] RFP's *SECTION III: Agency Lease Space Requirements & Architectural Program.*" The lease record drawings include the site plan, floor plan, elevations, and other drawings to comply with the architectural program in Section III of the RFP. PCD reviews the lease record drawings for "basic code compliance."

{22} Lease record drawings "are the Offeror's final qualification of the Bidding Phase of [the] procurement, and upon written approval the Offeror becomes the Lessor–Elect." Further, "[w]ritten notice shall

authorize the Lessor–Elect to enter into a Lease Agreement with the Agency." "Lease Agreement" is not defined in the RFP. The "lease" is the standard New Mexico Lease of Real Property (GSD Form 501–01), "including Performance Bond or Lease Record Drawings." It is to be prepared, signed, and submitted by the Lessor–Elect to the Agency, and then forwarded to the PCD Director for final approval. The signature of the PCD Director makes the lease "legal-and-binding." The last event is acceptance of occupancy once there is confirmation the actual lease space matches the lease record drawings.

{23} If the Lessor–Elect does not submit the lease in a timely manner, "lease award" may be made to the next highest ranked Offeror. "Any Offeror who is aggrieved in connection with the award of a Lease may protest to the [PCD] Director." The protest period begins "on the day following the date of written 'Notice of Award' from the Agency as approved by the [PCD] Director."

{24} The RFP refers to Rule 92–501 and to several Procurement Code provisions, including Sections 13–1–181 (Remedies prior to award) and 13–1–182 (Ratification or termination after award).

**C. The Actual RFP Process in This Case and the Protest Decision**

{25} In this case, DOH was the State executive agency seeking leased space under the RFP. Petitioners submitted a proposal. The proposal contained purchase-option language, with a detailed explanation why this option arrangement was good for both Petitioners and the State.

{26} After evaluating Petitioners' proposal, and based on PCD's express authority, DOH selected Petitioners as the Top–Ranked Offeror or Lessor–Elect. DOH gave Petitioners a Notice of Award, and notified the Director of PCD of that Notice of Award. Pursuant to PCD's express authorization and statement that PCD "look[ed] forward to receiving ... the Lease Record Drawings and the Lease Agreement," DOH gave its Notice to Prepare Lease Record Drawings to Petitioners, and informed the PCD Director of that notice. Petitioners prepared lease record drawings and also prepared a lease on

the required GSD form. Petitioners submitted the lease record drawings to PCD and DOH. DOH forwarded a set to PCD. Petitioners thereafter submitted the lease to DOH, and DOH, along with a Special Assistant Attorney General, signed the lease. The lease was then given to PCD.

{27} PCD saw only two "violations." PCD gave Petitioners five days to remedy them. First, PCD stated it did not receive signed (lessor/lessee) lease record drawings. PCD's concern regarding this "violation" disappeared at some point. It was not a basis for PCD's decision to reject Petitioners' proposed lease and cancel the RFP. Second, PCD required a "Proposed Lease Agreement without the lease-purchase option pursuant to Section 12.3 of GSD Rule 92–501." From all indications, the response of Petitioners and DOH was to actually remove the $1.00 purchase-option language from the proposed lease.

{28} The RFP process was not completed. The PCD Director did not sign the lease agreement and DOH did not accept occupancy. Yet Petitioners advanced through the RFP process even to the point of facially curing, if not actually, the only two expressed "violations" given by PCD as reasons "the RFP process had not been followed." Despite DOH's apparent desire that PCD sign the lease without the purchase option, PCD stopped the RFP process by cancelling the RFP because of what it termed, without any explanation, "legally disqualifying elements."

{29} PCD wrote a seventeen page denial of Petitioners' protest with Rule 92–501 and the GSD Form 501–01 Lease of Real Property attached. Pertinent to the Section 13–1–182 related determination that the award of the contract was in violation of law, PCD discussed Exhibit A to Petitioners' proposal in which Petitioners gave the reasons the lease-to-own proposal was good for DOH. Among other things, the lease-purchase option spread the cost of the building over its useful life, with the benefit of "home ownership" and "100 percent financing of asset cost." PCD was troubled by Petitioners' later position that the removal of the purchase

option did not affect the proposal or the lease price.

> If [Petitioners] did not intend these financing terms as stated in [the] proposal, it is now attempting to amend its proposal after receipt of the proposal in contravention of the terms and conditions of the RFP. To agree to lease terms premised upon the state buying the building over twenty years, but without the legal authority to exercise the option to purchase for one dollar, would not be in the best interest of the state.

In PCD's view, the proposed lease was not in the best interests of the State with or without the purchase option.

{30} In the final analysis, PCD deemed the proposal to be non-responsive because it contained the option to purchase and therefore violated Section 12.3 of Rule 92–501. PCD determined Section 13–1–182 applicable only if the protest were filed after "the award and execution of a valid, binding contractual agreement" and that, in this case, the proposed lease agreement had to have been approved and signed by the PCD Director.

### D.   The Parties' Contentions

{31} The district court interpreted "award of a contract" under Section 13–1–182 to mean "award of the [DOH] lease project" based on the notice of award and PCD confirmation.   GSD argues that this required the court "to imply a contract or contrive one for the purpose of calculating damages."   In either case, according to GSD, the court's ruling "permit[s] an award of contractual damages against PCD, in the absence of a valid, written contract involving any state agency" in direct conflict with the immunity granted by Section 37–1–23(A).   GSD calls this a "judicial repeal of the immunity granted by Section 37–1–23(A)."

{32} According to GSD, the only "contract" on which Petitioners can sue is the lease agreement signed by the PCD Director as required under Section 5.2 of GSD Rule 92–501:

> *Lease Agreements:* The PCD Director shall have final approval of all leases, lease amendments, lease extensions, exercise of options-to-renew and all other agreements subject to this rule.   **No such agreement shall be valid or binding on the State of New Mexico or any of its agencies unless it is in writing, signed by the appropriate parties and approved by the PCD Director.**   The PCD Director's signature shall not signify that PCD is a party to an agreement, but only that PCD has authorized the agreement and approved it for compliance with this rule.

{33} In addition, GSD argues, the RFP and lease form also expressly say that the lease is not valid (legal and binding) unless and until it is signed by the PCD Director. GSD contends that *Wisznia* is "virtually identical" to the case before us.   There, the New Mexico Supreme Court held that approval of a lease agreement by the PCD Director is a condition precedent to the formation of a binding lease agreement between a lessor and a State lessee agency.   *Wisznia*, 1998–NMSC–011, ¶ 15, 125 N.M. 140, 958 P.2d 98,.

{34} In their brief on appeal to this Court, Petitioners contend that under Section 13–1–182 the "defining moment is the *award*," the latest point of which was "when [Petitioners] delivered the Lease Record Drawings to PCD." In oral argument, Petitioners were more specific, contending that Section 13–1–182 is triggered at the time an offeror is selected as the top-ranked offeror and receives a notice of award under the RFP. Petitioners reason that the remedial goal of Section 13–1–182 is to assure that offerors who spend considerable amounts of time and money in the preparation of lease record drawings after being chosen as the top-ranked offeror are not left without compensation if the PCD Director later determines the award is in violation of law.

{35} Petitioners disagree with GSD's position that no contract was formed.   They argue that the RFP, Petitioners' response, DOH and PCD's authorization to proceed, and Petitioners' preparation and submission of the lease record drawings constitute a contractual offer and acceptance that come within the meaning of "award of a contract" under Section 13–1–182.   Petitioners further assert this transaction is a valid, written

contract. All that was left to be done, Petitioners contend, was for the PCD Director to perform the ministerial duty of determining whether the lease record drawings, already reviewed and approved by DOH, complied with specifications and building codes. This compliance was never at issue.

{36} Petitioners cite *Planning & Design Solutions* "in answer to PCD's contentions that there are *no* remedies available to Renaissance which can address the abuse of the procurement process by [PCD]." Petitioners appear to ask this Court to follow the approach taken in that case and "look beyond the contract issues and examine the conduct of the parties to determine whether equitable remedies might apply."

### E. The Result in This Case

{37} The question is whether "award of a contract" in Section 13–1–182 in a lease procurement means "lease award" at the site-and-offeror-selection stage of the RFP process or at some other stage in the RFP process, short of the signing of the lease by the PCD Director. If it does, then we must determine if recovery is dependent upon that "lease award" being a "valid, written contract" under Section 37–1–23(A), or whether we look solely to Section 13–1–182 and not at all to Section 37–1–23(A).

{38} In our view, Section 13–1–182 entitles Renaissance to relief in this case. The "award of a contract" in the RFP lease procurement process occurs over time in steps. The issuance of the RFP sets the process in motion and the RFP sets that process out in detail. After responses are received, the most significant event in the award process occurs with the selection of the top-ranked offeror by the notice of award. Under GSD's view, however, there is no stepped award process. According to GSD, the "award of a contract" under Section 13–1–182 does not occur until the lease contract is signed by the PCD Director. The process involving notice of award, preparation and approval of lease record drawings, lease contract approval by the agency and attorney general, and finally lease contract approval by the PCD Director is, for the purpose of defining "award of a contract," all collapsed by GSD into one

event: the signature of the PCD Director on the lease contract. We do not accept this narrow view of the process, or of the meaning of the words "award of a contract" in Section 13–1–182.

{39} The more reasonable construction of Section 13–1–182 under the circumstances of this case is that it is meant to provide reimbursement and recovery of a reasonable profit for time and money spent in reliance on a lease award grant of lessor-elect status under the RFP. Barring the illegality of some aspect of the process, that status is one in which the lessor-elect should be the lessor once the lease record drawings are prepared and determined to be in compliance with building and zoning requirements. The lessor-elect may fail to provide proper lease record drawings, but this is not a legality concern that would implicate Section 13–1–182, which is implicated only when the award of the contract is in violation of law. *See* § 13–1–182.

{40} We hold that, in this lease procurement case, the selection of Renaissance as the top-ranked offeror and the Renaissance site through the notice of award was the "award of a contract" under Section 13–1–182. In this case, before the notice of award was issued, PCD should have carefully reviewed the proposal for legality and should have made a timely determination as to legality. Where the RFP is terminated after an award for an illegality apparent in the proposal before the award, PCD can, as here, find itself subject to Section 13–1–182. We see no policy or economic purpose in choosing the specific moment of the PCD signature as the trigger for Section 13–1–182 relief, and GSD has provided none.

{41} We determine that the immunity statute does not bar relief under Section 13–1–182. Section 37–1–23(A) relates specifically to actions "based on contract." The present action, however, is purely statutory, based on a right granted in the Procurement Code, where a lessor-elect in the lease procurement RFP process suffers loss because the State later determines a proposal in response to the RFP is in violation of law.

{42} The parties have discussed Section 13–1–181 in arguing the proper interpretation of Section 13–1–182. Section 13–1–181 says that if, "prior to award, the state purchasing agent or a central purchasing office makes a determination that a solicitation or proposed award of a contract is in violation of law, then the solicitation or proposed award shall be cancelled." Nothing in our decision conflicts with this section which gives PCD the authority before a notice of award to cancel an RFP if it determines the RFP, or any proposed award based on the RFP, is in violation of law.

{43} We have reviewed various other sections of the Procurement Code that contain the words "award of a contract." *See* §§ 13–1–69, –74, –100, –108, –139, –140, –144, –172, –173, –177, –181, –192, and –198.[3] Our decision today does not conflict with those provisions. Nor do we think that any of those provisions reflects, as GSD contends, a legislative intent requiring us to interpret Section 13–1–182 as providing relief only if an RFP is terminated after the lease contract is signed by PCD.

{44} We do not agree with GSD's view that *Wisznia* is controlling precedent requiring reversal. *Wisznia* was an action for damages for breach of contract, and alternatively, on a theory of estoppel. *Wisznia*, 1998–NMSC–011, ¶ 1, 125 N.M. 140, 958 P.2d 98. The facts are similar to the present case. Wisznia responded to a HSD request for proposal involving the construction of a building in which HSD would lease space. *Id.* ¶ 2. HSD selected Wisznia's proposal sub-ject to final GSD approval of building plans and specifications and a legislative appropriation for the rent payments. *Id.* ¶¶ 3–4. HSD cancelled the RFP. *Id.* ¶ 8. Wisznia sued, contending that a contract was formed when HSD selected his bid. *Id.* ¶¶ 9, 11. The Supreme Court held that "GSD approval and legislative appropriation were not mere legal formalities; they were conditions precedent to contract formation," and "a contract was not formed in this case." *Id.* ¶ 15. The Court also determined that the circumstances did not warrant application of the doctrine of estoppel, denying what the lower court characterized as the "equitable remedy." *Id.* ¶¶ 16–18. *Wisznia* is not controlling precedent. The meaning and applicability of Section 13–1–182 was neither argued to nor mentioned by the Supreme Court. Neither Section 37–1–23, nor Rule 92–501, was involved.

## CONCLUSION

{45} We affirm the decision of the district court.

{46} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Judge, and IRA ROBINSON, Judge.

---

**3.** The Procurement Code uses "award" in various ways. We note, for example, that Section 13–1–100 uses both "award" and "execution" in relation to "contracts," apparently to distinguish between the two terms. In Section 13–1–105, a "bid" is "accepted for consideration for award." In addition, an "award of professional services" is made to an offeror whose proposal meets certain requirements. Section 13–1–117.1. Section 13–1–143 refers to a "contractor award." Under Section 13–1–147, a bidder can "withdraw its bid before award." A "multiple source award" may be made "when awards to two or more bidders or offerors are necessary." Section 13–1–153.